STATE OF CONNECTICUT *v.* RONALD J. HASSETT

KING, C. J., ALCORN, HOUSE, RYAN and FITZGERALD, Js.

Argued May 5—decided June 13, 1967

*James D. Cosgrove,* public defender, for the appellant (defendant).

*John D. LaBelle,* state's attorney, with whom, on the brief, was *George D. Stoughton,* assistant state's attorney, for the appellee (state).

ALCORN, J. The defendant was indicted on two counts of murder in the first degree. He was charged in the first count with the murder of Mary E. Nugent and in the second count with the murder of George Hassett. He pleaded not guilty and chose a trial to the court. Pursuant to § 54-82 of the General Statutes the court was composed of three judges. The defendant was found guilty of murder in the second degree on the first count and guilty of murder in the first degree on the second count. A sentence of life imprisonment was imposed on each count, the sentences to run concurrently, and the defendant has appealed from the judgment rendered.

The claims which are pursued in the defendant's brief are that the court erred in admitting into evidence testimony concerning statements made by the defendant to the police after he was taken into custody, in admitting his shoes into evidence, and in concluding on all the evidence that he was guilty of the crimes charged beyond a reasonable doubt. No issue is made of the court's conclusion as to the degrees of murder.

Two elements of the case need to be emphasized at the outset. The first is that the trial took place

early in 1964, and the judgment appealed from was rendered on February 11, 1964. Consequently, under the decision in *Johnson* v. *New Jersey,* 384 U.S. 719, 721, 86 S. Ct. 1772, 16 L. Ed. 2d 882, decided on June 20, 1966, the principles established in *Escobedo* v. *Illinois,* 378 U.S. 478, 490, 84 S. Ct. 1758, 12 L. Ed. 2d 977, and in *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 694, are not controlling. The second is that we are not, in the present case, concerned with the admissibility in evidence of a confession because the defendant, in his statements to the police, did not purport to implicate himself in any crime.

Prior to the decision in the *Miranda* case, the United States Supreme Court had recognized a distinction between the requirements for the admissibility of an admission and a confession, indicating, in effect, that the fourteenth amendment to the constitution of the United States did not require the same reliability tests for an admission as for a confession. *Stein* v. *New York,* 346 U.S. 156, 162 n.5, 73 S. Ct. 1077, 97 L. Ed. 1522. In *Opper* v. *United States,* 348 U.S. 84, 91, 75 S. Ct. 158, 99 L. Ed. 101, however, the court pointed to the same need for corroboration, under federal procedure, in the case of statements showing essential elements of a crime necessary to supplement an otherwise inadequate basis for conviction as was already required in the case of confessions. Statements immaterial to guilt or innocence were, however, exempted from the rule. It was not until the *Miranda* decision that the rule enunciated in that case was held to be equally applicable to confessions and admissions and, as to the latter, regardless of whether they were inculpatory or exculpatory. *Miranda* v. *Arizona,* supra, 476, 477.

Our own rule has long recognized a distinction between a full confession and an admission; *State* v. *Coffee,* 56 Conn. 399, 414, 16 A. 151; but nevertheless our rule has required that statements which did not amount to a confession of guilt must still be shown to be voluntary in order to be admissible in evidence. *State* v. *Wakefield,* 88 Conn. 164, 168, 90 A. 230.

In considering the claim that the court erred in admitting testimony concerning the statements made by the defendant to the police while he was in custody, we accept the finding made by the trial court except for the conclusion that the statements were voluntary. This conclusion we review in the light of the appendix to the defendant's brief. *State* v. *Traub,* 150 Conn. 169, 176, 187 A.2d 230, remanded for reconsideration on another ground, 374 U.S. 493, 83 S. Ct. 1899, 10 L. Ed. 2d 1048; see *State* v. *Traub,* 151 Conn. 246, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503. This appendix discloses only that, at his trial, the defendant, after being carefully cautioned and advised by his counsel in open court, chose to take the witness stand in his own defense. Thereupon he testified unhesitatingly concerning the same subject matter and to the same effect as in his earlier statements to the police. There is no claim, either in his testimony at the trial or on this appeal, that he was subjected to any mistreatment, either physical or mental, that any promises or inducements were held out to him, or that he sought or was denied the advice of counsel before talking, apparently freely and unrestrainedly, with the police. The effort to have the testimony concerning the statements excluded was grounded on the claim that the statements were involuntary solely because the defend-

ant was under arrest when they were made. The trial court determined, as a question properly within its province, that the statements were voluntary. *State* v. *Tillman,* 152 Conn. 15, 16 n.1, 202 A.2d 494; see *Jackson* v. *Denno,* 378 U.S. 368, 380, 84 S. Ct. 1774, 12 L. Ed. 2d 908. That conclusion is not to be disturbed if it was reasonable under the evidence and not violative of some rule of law. *Ker* v. *California,* 374 U.S. 23, 34, 83 S. Ct. 1623, 10 L. Ed. 2d 726. All of the surrounding circumstances, including the duration and conditions of the detention, the attitude of the police, and all factors affecting the defendant's powers of self-control are pertinent to whether his statements were the result of a free and unconstrained choice, in other words, were truly voluntary. *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037.

It appears that the police arrived at the home of the victims of the crimes shortly after 10 p.m. on August 5, 1963, and found their bodies under circumstances clearly indicating that they had met foul play; that the defendant had been seen at the home between 4:30 and 5 o'clock that afternoon; and that an order to apprehend him was issued shortly after 11 p.m. The defendant was taken into custody by Hartford police officers less than two hours later and was at once taken to police headquarters. The officer who apprehended him was his next door neighbor and had known him for fifteen years. On arriving at police headquarters, the defendant was met by another officer who knew him, introduced him to other officers present and said: "You don't have to talk to us. You don't even have to tell us the light is lit, but we're conducting an investigation and the purpose of the investigation is to find out any-

thing that you might know about this particular case." He was then asked to give an account of his activities on August 5. During the next hour, the statements complained of were made by the defendant to the four or five officers present, after which he was told by the police that he was being charged with murder. His statements included the fact that he had been at the home of the victims, which the police already knew; his assertion that he had left the house about 1:30 p.m. on August 5; and a description of his subsequent wanderings about the streets of Hartford and West Hartford until he was apprehended. He specifically denied any knowledge of the deaths. The nature of the interrogation, the total absence of any duress or beguilement, the short period of time involved, and the substance of what was said, all indicate that the court was fully justified in concluding that the statements were voluntary and in admitting the testimony concerning them.

We turn now to the claim that the court erred in admitting the defendant's shoes in evidence as an exhibit. During the hour in which the defendant made the statements referred to above, the police asked him to remove his clothing, including his shoes. When the shoes were removed, one of the officers noticed spots or stains on the soles. The defendant claims that the shoes were not legally admissible in evidence because the seizure of the shoes was not incident to the admittedly lawful arrest. Other objections voiced during the long discussion concerning the admissibility of the shoes in evidence are not pursued in the appeal.

As already stated, an order to apprehend the defendant had been issued about 11 o'clock on the evening of the discovery of the crime. He was

taken into custody less than two hours later, and it was during the period of approximately one hour between the time when he was actually taken into custody and the time when he was told that he would be charged with murder that the police took possession of his shoes. No claim is made that the defendant's apprehension was illegal. It is clear that, when a person is lawfully arrested, the police have the right, as incident to that arrest, to make a contemporaneous search of the person arrested. *Warden, Maryland Penitentiary* v. *Hayden,* 387 U.S. 294, 298, 87 S. Ct. 1642, 18 L. Ed. 2d 782; *Preston* v. *United States,* 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed. 2d 777; *United States* v. *Rabinowitz,* 339 U.S. 56, 60, 70 S. Ct. 430, 94 L. Ed. 653; *State* v. *Miller,* 152 Conn. 343, 347, 206 A.2d 835; *State* v. *DelVecchio,* 149 Conn. 567, 573, 182 A.2d 402. It is unnecessary, under the circumstances of the present case, to discuss whether the defendant was "arrested" when he was taken into custody on the street or when he was told, about an hour later, that he would be charged with murder. The happenings within that brief interval must be considered a single transaction. The shoes were admissible in evidence for the reason that they were taken into possession by the police incident to a lawful arrest. *Warden, Maryland Penitentiary* v. *Hayden,* supra; *State* v. *Elliott,* 153 Conn. 147, 154, 215 A.2d 108. Moreover, the introduction of the shoes did not compel the defendant to become a witness against himself. *Schmerber* v. *California,* 384 U.S. 757, 761, 86 S. Ct. 1826, 16 L. Ed. 2d 908.

We come then to the final claim that the evidence was not sufficient to prove the defendant guilty beyond a reasonable doubt. To test this claim we examine the evidence printed in the appendices to

the briefs and such exhibits as are made part of the record. *State* v. *Davis,* 153 Conn. 228, 229, 215 A.2d 414; *State* v. *Malm,* 142 Conn. 113, 115, 111 A.2d 685; *State* v. *DiBattista,* 110 Conn. 549, 552, 148 A. 664. George Hassett was the defendant's uncle and had lived at 101 Shultas Place, a six-family house in Hartford, for about seventeen years. He lived there with Mary Nugent, who was the defendant's grandaunt. The defendant, who is twenty-six years old, lived about four blocks away, at 106 Bond Street. The defendant left high school at the age of sixteen and had been unemployed for about five years. He had been coming to 101 Shultas Place nearly every day for approximately that five-year period. During that time, unfriendly arguments had been overheard between him and George Hassett, mainly about money. On one occasion, in 1959, the altercation became so severe that the police were called.

On August 5, 1963, the defendant went to 101 Shultas Place at about 7:40 in the morning. His stated purpose was to care for Mary Nugent, who was seventy-two years of age and in poor health. Both George Hassett and Mary Nugent were in the house when he arrived. Mary Nugent was in bed. George Hassett left for work shortly after the defendant arrived. George Hassett arrived at work at about 8:45 a.m. and left at about 1:20 p.m. It was his custom to visit his mother at a convalescent home daily. On August 5, he failed to appear, and a nurse telephoned to his home three times between 3 p.m. and 6 p.m. but received no answer. She thereupon telephoned his brother's wife. About 6:30 p.m. on that day, another tenant at Shultas Place, in response to a telephone call from the defendant's mother, went to the rear door of 101

Shultas Place and found it locked. She knocked and got no answer. That evening, about 8:30, she again went to the front door, which she also found locked, and knocked but received no response. She tried other doors leading from the hall into the apartment, all of which she found locked, but the hall floor at the front door appeared to have been wiped. About 10:01 p.m. on August 5, a Hartford police officer was ordered to go to 101 Shultas Place and investigate the first floor apartment at that address. Upon arriving, he found all of the entrance doors locked and a huge stain which appeared to be blood on the floor outside the front doorway. He entered the apartment through a window and found the body of George Hassett lying on the floor inside the front door. His skull had been shattered, and there was a quantity of blood and brain matter on the floor near the body. A three-inch galvanized pipe about a foot and a half long lay across his legs. In the bedroom, the officer found the body of Mary Nugent. She had died of a broken neck, in addition to which she had suffered numerous bruises, rib fractures and lacerations. Other officers arrived to assist in the investigation, and, in the course of interviewing persons in the neighborhood, they received information concerning the defendant. An officer went to the defendant's home and found that the defendant was not there. Shortly after 11 p.m., the police captain in charge of the investigation ordered the apprehension of the defendant. The defendant was taken into custody by Hartford police officers at the corner of Main and Pratt Streets in Hartford at approximately 12:50 a.m. on August 6. The defendant was wearing a brown winter suit which he had obtained from a cleaning establishment that day. At the police headquar-

ters he was asked to disrobe, and two stains were observed on the soles of his shoes. He had, in his pocket, a key which fitted the lock at 101 Shultas Place. He voluntarily submitted to a blood test at a hospital in Hartford.

George Hassett appeared to have died at approximately midday on August 5, and Mary Nugent appeared to have died earlier that day. The quantity of blood on the floor around the body of George Hassett was such that it would have been impossible for anyone to walk through the hallway without treading in the blood. The blood type of George Hassett was group O. There was group O human blood on the end of the galvanized pipe found on his body. The stains on the defendant's shoes were made by group O human blood. The defendant's blood type was group A, and that of Mary Nugent was group A. The defendant's wristwatch was found in the apartment at 101 Shultas Place where he testified that he had taken it off and left it. The defendant was seen sitting in the kitchen of the George Hassett apartment at about 4:30 in the afternoon of August 5 and on the back porch of the apartment between 4:30 and 5. He was also seen walking on Shultas Place toward Franklin Avenue sometime between 4 and 5 o'clock in the afternoon, wearing a light tan suit. Between 4 and 5 o'clock that afternoon he went to a cleaning establishment on Franklin Avenue about fifty feet south of Shultas Place, wearing a light tan suit. He removed this suit, left it for cleaning and put on a brown winter suit which he took from a rack in the cleaning establishment. The tan suit which was left for cleaning had group O human blood on the cuff and on the trousers. The defendant, while admitting that he had been at 101 Shultas Place

during the morning of August 5, claimed that he had left at approximately 1:45 p.m. after George Hassett had come home from work and that he did not kill either George Hassett or Mary Nugent.

From the evidence, the court, with such reasonable inferences as it was entitled to draw therefrom, could reasonably have concluded that the defendant was, beyond a reasonable doubt, guilty of the two murders with which he stood charged.

There is no error.

In this opinion the other judges concurred.