STATE OF CONNECTICUT *v.* ARTHUR J. DAVIS

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued May 7—decided July 1, 1969

*Anthony V. DeMayo* and *Richard F. Banbury,* for the appellant (defendant).

*David B. Salzman,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

RYAN, J. The defendant was charged with six counts of murder in the first degree. He elected trial to a court of three judges as provided by § 54-82 of the General Statutes (Rev. to 1968). The court found him guilty as charged on each of the six counts of the indictment and imposed the death sentence. The defendant has appealed from the judgment rendered. He assigns error in the action of the trial court (1) in permitting the grand jury to consider the indictments against him, (2) in concluding that upon all the evidence he was guilty as charged beyond a reasonable doubt, and (3) in imposing the death penalty under §§ 53-10 and 54-100 of the General Statutes (Rev. to 1968) in violation of the prohibition of cruel and unusual punishment by the eighth amendment to the constitution of the United States.

In his first assignment of error, the defendant claims that the grand jury selection process as conducted in New Haven County resulted in a "systematic and intentional exclusion of electors" from service on the grand jury which indicted him. On September 30, 1966, the Superior Court ordered a grand jury of eighteen electors and two additional electors as alternates to be summoned to appear in New Haven on October 10, 1966. The grand jury was called to inquire into offenses alleged to have been committed by the defendant. Before the grand jury was called into the courtroom, counsel for the defendant

addressed the court *(Pastore, J.)* upon the method of selecting grand jurors in New Haven County. He made the statement that a number of the grand jurors summoned for that day sat on other grand juries during the previous two years and "have become accustomed to hearing these crimes of violence described, police work described, the brutality described, the bloodshed described." He then added that he did not believe that this was the intent of the grand jury system in Connecticut. The defendant neither offered nor presented evidence as to the identity of any member or members of the grand jury who he claimed had served previously on more than one grand jury or as to any particular panel constituting a grand jury. Nor did he offer or present to the court any particular information relating thereto. The defendant did not ask the court to take judicial notice of any alleged facts in the statement of counsel, no ruling on evidence was made and of course no exception was taken. The defendant did not challenge the "quality" of persons constituting the grand jury or the procedure followed by the high sheriff in selecting its members.

The defendant's contention that there was a systematic and intentional exclusion of electors from service on the grand jury is based on the statement of the high sheriff of the county, who had not been called as a witness but who arose in court and voluntarily stated, that he chose for service on the grand jury only "high class people" who "understand what a grand jury is." The defendant urges that this method constitutes an exclusion of electors from service on the grand jury which is proscribed by the fourteenth amendment to the United States constitution. See *Norris* v. *Alabama*, 294 U.S. 587, 591, 55

S. Ct. 579, 79 L. Ed. 1074; *State* v. *Davies,* 146 Conn. 137, 141, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537.

Were this not a capital case we should give this assignment of error no further consideration, since it was not properly raised. In fact, at no time was the claim made in the court below that there was a systematic and intentional exclusion of electors from service on the grand jury. In order that the defendant may be given every consideration, we have decided to consider this claim even though it was not properly raised. *State* v. *Reid,* 146 Conn. 227, 230, 149 A.2d 698; *State* v. *Davies,* supra, 145; *State* v. *Walters,* 145 Conn. 60, 64, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45. Upon properly raising an objection, the burden would be on the defendant to produce evidence sufficient to establish at least a prima facie case of the systematic exclusion of a class from the grand jury selection process. *Coleman* v. *Alabama,* 389 U.S. 22, 23, 88 S. Ct. 2, 19 L. Ed. 2d 22; *Hernandez* v. *Texas,* 347 U.S. 475, 480, 74 S. Ct. 667, 98 L. Ed. 866; see *Whitus* v. *Georgia,* 385 U.S. 545, 550, 87 S. Ct. 643, 17 L. Ed. 2d 599. The record is clear that the defendant produced no evidence which would tend to establish any such systematic exclusion, and the finding of subordinate facts is not attacked in this appeal. There was no actual tender of proof, nor is it claimed that the court refused to entertain such an offer. In the absence of such evidence, a presumption arises that the officer in charge of the selection of the grand jury performed his duty fairly and without discrimination against any class. See *Glasser* v. *United States,* 315 U.S. 60, 87, 62 S. Ct. 457, 86 L. Ed. 680; note, 1 A.L.R.2d 1291, 1296. No claim was made in the trial court, nor is it now

urged, that there was any attempt to choose or to exclude electors in the selection of the grand jury on the basis of race, creed or national origin or to discriminate against any class. In the light of the defendant's failure to produce any evidence rebutting the presumption, we must conclude that the selection of the grand jury was completely proper.

In passing upon the claim of the defendant that the court below was in error in concluding that the defendant was guilty as charged beyond a reasonable doubt, we determine whether upon all the evidence the court could reasonably have reached the conclusion that the defendant was guilty of wilful, deliberate and premeditated murder. *State* v. *Malm,* 142 Conn. 113, 115, 111 A.2d 685; *State* v. *Simborski,* 120 Conn. 624, 626, 182 A. 221; *State* v. *Dodez,* 120 Conn. 216, 219, 179 A. 643.

For about four years prior to August 23, 1966, the defendant had lived in a common-law relationship with Gloria Baskerville, commonly known and hereinafter referred to as Fanny Baskerville. They had two children, and two other children of Miss Baskerville lived with them. On Tuesday, August 23, 1966, the defendant went to work on the midnight shift and returned home shortly after 8 o'clock Wednesday morning, August 24. His two children, the younger being a month old, were with his mother, the defendant's common-law wife having left the home sometime early Wednesday morning. The defendant then went out to look for Fanny. He visited the house of her sister Leatrice McClure on two occasions that day. He asked Leatrice for the addresses and telephone numbers of her sister Katherine Anderson and her brother, John McClure, both of whom lived in Jersey City, New Jersey. He then decided to drive to New Jersey to find out if

Fanny was staying there with her relatives. He put a shirt and pants in the car, together with a carbine and a pistol. He visited the homes of two of Fanny's relatives in Jersey City. He talked to Rosalind Anderson, who is Fanny's niece, shortly after noon on Wednesday, at 488 Ocean Avenue, Jersey City. The defendant kept asking her if she knew where Fanny was and if Fanny had telephoned. He also asked if he could look around the house to see if Fanny was there, and, upon receiving permission, he did so. Upon coming out of the house, he took a rifle and a pistol from the car and put them in the trunk of the car. He had a brown sweater over his shoulder.

The defendant returned to New Haven the same day, and at 10 p.m. he visited the home of Fanny's sister-in-law, Gwendolyn McClure, still seeking Fanny. After that he drove around in his car and visited two taverns. At 3 a.m. Thursday, August 25, he went back to the residence of Leatrice McClure, again inquiring about Fanny. Leatrice said to the defendant: "If someone aggravates you about my sister leaving you, you will hurt somebody, won't you?" He said "Yes." Although Leatrice knew where her sister was, she refused to tell the defendant because she was afraid he would injure her. On August 25, at about 9 p.m., the defendant came again to 16 Northeast Drive where Leatrice McClure resided with her mother, Mrs. Mary McClease, her grandmother, Mrs. Alice Pelham, her sisters, Charmaine McClease and Francine McClease, a brother, Royal McClease, and her daughter, Leronda McClure. The defendant asked Leatrice if Fanny had called and inquired of her mother, Mary McClease, concerning Fanny. He said, "I'll see you later," and left the house.

During the time that the defendant and Fanny lived together he struck her frequently. On one occasion, when she was three months' pregnant, he choked her. On another occasion he struck her, choked her, threatened her with the pistol, and told her he ought to blow her brains out. There were times when he would take the carbine out, play with it and point it at her. On these occasions he always used to say: "Well, if I have to use this—shoot anyone—I'm going to take a whole lot with me." He did not like Fanny's family and said that her family was not worth anything. On the night of August 25, the defendant was with James Powell, Jr., at the Monterey Restaurant between 8:30 and 9 p.m. In the course of their conversation, the defendant told Powell that he was "going to hurt someone tonight."

The apartment located at 16 Northeast Drive consists of a living room and a kitchen with a utility closet on the first floor. The second floor contains four bedrooms and a bathroom. Shortly before midnight on Thursday, August 25, the defendant drove up in a Chrysler car and stopped. He got out of the car and walked into the courtyard toward 18 Northeast Drive, carrying a carbine held down by his right side. A shot was fired, and the defendant came out of the yard and said he had shot a dog. He then got back in his car and sat there for about a minute. After that he went to the trunk of the car, took out a brown sweater, got back in the car and sat there for about another minute. He then left the car with the brown sweater wrapped around the carbine and walked in the direction of 16 Northeast Drive, where the McCleases lived. The defendant entered the apartment shortly after midnight. When he entered, Leatrice McClure was standing

near the stove over Mrs. Carolyn Sykes, who was sitting in a chair. Leatrice was doing Carolyn's hair. The defendant lifted the carbine, pointed it at Mrs. Mary McClease and shot her. The defendant did not say anything, and no one had moved. Mrs. McClease had been sitting in a chair in the kitchen by the radiator. After he shot Mrs. McClease, the defendant looked over at Neal White, who was seated at the kitchen table in front of Mrs. McClease. He then shot White, who fell out of the chair. White was a friend of Mrs. McClease and had just driven her to New Haven from North Carolina. After shooting White, the defendant shot the dog which had crawled over to him and looked up at him. The defendant then lifted the carbine and pointed it at Leatrice McClure and Carolyn Sykes. As he fired, Leatrice fell to the floor pretending she was shot. Carolyn started to run toward the utility closet and was shot by the defendant. The defendant then went upstairs and shot Francine McClease and Richard Leathers. He also shot Michael Sykes. Michael's body was found in the living room. Mary McClease, Neal White, Michael Sykes, Carolyn Sykes, Richard Leathers and Francine McClease died from gunshot wounds. Three of the victims had been shot once. Each of the other three had two bullet wounds.

After the shootings the defendant changed his trousers and left the house, carrying the carbine straight up and down and swinging it as he walked. The brown sweater was in his hand around the carbine. The defendant was not running. He walked at the same pace at which he walked when he entered the house. He put the carbine in the trunk of the car, sat in the car for almost a minute, and then drove off. He drove the car down Dixwell Avenue and Broadway and went through four or five red

lights. He was apprehended in New Jersey after pursuit by New Jersey state troopers which began on the New Jersey Turnpike near Passaic at about 3:40 a.m. on August 26, 1966, and continued for some forty-eight miles at speeds which reached eighty miles per hour. As one of the officers opened the door of the defendant's car, the defendant reached for his pistol, which was fully loaded and had a cartridge in the chamber. On the floor of the front seat on the right side was a carbine, fully loaded, with a cartridge in the chamber. A spent .30-caliber cartridge was found on the rear seat of the vehicle behind the driver, and a box of .30-caliber cartridges was on the floor beneath the carbine. It seems obvious that the carbine had been reloaded after the shootings occurred.

The defendant claims that there was no evidence of premeditation to substantiate the conclusion that the defendant was guilty of murder in the first degree. The basic claim of the defendant is that "this tragedy was, in fact, a sudden, impulsive occurrence." The evidence indicates clearly that it was neither sudden nor impulsive. The trial court had in evidence before it the statements frequently made by the defendant to Fanny that if he had to shoot someone he was "going to take a whole lot" with him; his statements indicating a lack of regard for her family; his admission to Leatrice McClure at 3 a.m. on Thursday, August 25, that if someone aggravated him about Fanny's leaving him he would hurt someone; and the statement made by the defendant between 8:30 and 9 p.m. on August 25 that he was "going to hurt someone tonight." The defendant's whole course of conduct indicated increasing anger, resentment and animosity towards the members of Fanny's family because they refused to

inform him of her whereabouts and because he believed they were deceiving him. The evidence indicated that the defendant acted with great deliberation before entering the McClease home and that there was ample time not only to reflect fully upon what he was about to do but to plan his approach by concealing the carbine with a sweater. The length of time necessary to deliberate, or to form a specific intent to kill, need only be time enough to form a wilful, premeditated and specific intent to kill before the killing, and if there be such time, it is sufficient, no matter how long or how short it may be. *State v. Simborski,* 120 Conn. 624, 629, 182 A. 221; *State v. DiBattista,* 110 Conn. 549, 561, 148 A. 664. "There is also a difference, in the length of time reasonably required, between a killing resulting from unforeseen circumstances and one for which the killer has prepared himself by getting and loading two . . . [weapons]. *State v. Palko,* 121 Conn. 669, 673, 186 A. 657." *State v. Zukauskas,* 132 Conn. 450, 455, 45 A.2d 289. In the instant case the defendant had been carrying in his car a loaded pistol and a loaded carbine since the morning of August 24. "Such conduct spells wilfulness, premeditation and deliberation." *State v. Donahue,* 141 Conn. 656, 659, 109 A.2d 364, cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257. "But the length of time elapsed is not the test. The question is whether the court could reasonably conclude that there was sufficient time to enable the mind of the defendant to conceive a wilful, deliberate, premeditated intent to kill before the act was done." *State v. Malm,* 142 Conn. 113, 118, 111 A.2d 685. Upon all the evidence the conclusion of the trial court that the defendant formed a wilful, deliberate, intent to kill not only one person but several was reasonable and logical.

The defendant also urges that he was distraught, anxious and concerned in the search for his common-law wife and that this state of mind, together with his intoxication, required a conclusion that he was not guilty of wilful, deliberate and premeditated murder. There was evidence produced by the defendant that he had been drinking extensively from the time of his return from work on the morning of August 24 until just before the shootings. Franklin Dunham, called by the defendant, testified that the defendant was highly intoxicated at about 8:20 p.m. on August 25 and that thereafter he and the defendant consumed a tenth of a quart of whiskey while seated in a car near the Monterey Club and then had six or seven more drinks in the club between 9:20 and 11 p.m. The state offered in evidence Dunham's statement taken at 4:30 a.m. on August 26 wherein he said that the defendant was sober at 8 p.m. on the night of August 25 and that he left the defendant at that time and did not see him again. The state produced evidence that Vincent Morton cashed a check for the defendant between 9 and 11 p.m. on August 25 and at that time the defendant was not intoxicated. This was within an hour or two of the shootings. There was nothing unusual about his appearance as he walked into the McClease residence immediately before the shootings. The trial court was also entitled to consider the deadly accuracy of the defendant's marksmanship.

While voluntary drunkenness is no excuse for crime, a killing by one who, at the time the act was committed, was in such an advanced stage of intoxication that he was incapable of conceiving and carrying into execution a deliberate plan to kill, or was mentally incapable of intent or premeditation, or

was beyond the power of self-control at the time, lacks the necessary elements of murder in the first degree. *State* v. *Dortch,* 139 Conn. 317, 323, 93 A.2d 490. There was ample evidence before the court not only that the defendant had not reached such a stage of intoxication but that the contrary was true.

The defendant also claims that his mental condition at the time of the offenses was such that he was not capable of wilful, deliberate, premeditated murder. A psychologist, testifying as a defense witness, stated that he had interviewed the defendant and had administered four psychological tests to him. The test findings suggested that the defendant had a character disorder in which tendencies toward dependency, depression, jealousy, and suspiciousness and poor ability for affect control were prominent; that the defendant is a person of average mental ability; that in situations where his feelings are not aroused he is quite capable of rational thinking and of logical procedure but that his ability to remain rational is subject to the "fluctuations which go with the ups and downs of his feelings"; that when he feels alone he becomes frantic and anxious, his resentments become strong, and he becomes unable to use his intelligence, judgment and rationality; that his jealousy, resentfulness and suspiciousness had a paranoid quality but that this trend was not so great that it would add up to a psychotic picture; that at the time of the offenses the defendant's free will was affected by irrational jealousies and resentments which at other times he would be able to judge; and that the defendant's act was a good example of "irresistible impulse." A psychiatrist called by the defendant testified that the defendant acted in such a way as to indicate that his emotional

condition precluded his use of free will and thus he was not responsible for his actions at the time of the shootings and that the defendant's character defect is such that he does not have the quality of free will under certain stress.

The legal standard of sanity or capacity to commit crime was reviewed and approved by this court in 1959.[1] "To be the subject of punishment, an individual must have mind and capacity, reason and understanding enough to enable him to judge of the nature, character and consequence of the act charged against him, that the act is wrong and criminal, and that the commission of it will justly and properly expose him to penalty." *State* v. *Davies,* 146 Conn. 137, 144, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537. A defendant is within the law's protection if his mind is so diseased or abnormal as to render him incapable of resisting an impulse to do an otherwise criminal act. *State* v. *Pastet,* 152 Conn. 81, 84, 203 A.2d 287; *State* v. *Donahue,* 141 Conn. 656, 664, 109 A.2d 364, cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257; *State* v. *Wade,* 96 Conn. 238, 242, 113 A. 458.

While the state presented no medical experts, it offered evidence concerning the course of conduct and behavior of the defendant during the time he lived with Fanny, his common-law wife, a period of about four years. It also offered detailed evidence of his actions on August 24 and August 25 both before and immediately after the shootings. The defendant himself testified in considerable detail concerning his movements for a period of forty-eight

---

[1] In 1967, the legislature enacted No. 336 of the 1967 Public Acts (§ 54-82a of the General Statutes), effective June 13, 1967, which now states the test of insanity when used as a defense in criminal cases.

hours before the offenses. He testified concerning his visit to Leatrice McClure on the night of August 25. There was evidence that this was about 9 p.m. The defendant said that he then returned to the taverns and that the next thing he remembered was driving around crying and being in a bar somewhere in New York City. The defendant next recalled being apprehended by the New Jersey police. The weight to be given to the testimony of the defendant as well as the testimony of all other witnesses was for the trial court to determine. The court also had before it the evidence of the defendant's psychiatrist, who, in relating the history given him by the defendant, testified that when the defendant "got to the point of the alleged crime he stopped talking and became too upset to talk." This differs greatly from the defendant's version on the witness stand. The psychiatrist was unable in his examination to reach a conclusion with reasonable medical certitude as to the psychiatric status of the defendant. He reached an opinion as to whether the defendant's mental condition affected his actions only after a review of the psychologist's psychological test results. At the time of his examination of the defendant, the psychiatrist had not obtained a history from the defendant concerning the shooting of various people and was unaware of the facts at the scene early on the morning of August 26. The trial court was entitled to consider these facts in evaluating the testimony of the experts.

The state has a right, in the first instance, to rely on the presumption that the defendant was sane at the time of the offenses alleged in the indictment, and thereupon it becomes the privilege of the accused to offer such evidence as he desires upon the subject of his mental condition. As soon as substan-

tial evidence tending to prove insanity comes into the case, the presumption loses all operative effect. The state may then rebut this evidence if it desires or submit the issue to the court upon the evidence offered. In either case, the issue having been raised, the burden rests upon the state, as it does in all other essential elements in the case, to prove beyond a reasonable doubt that the accused was legally sane and responsible at the time the offenses were committed. *State* v. *Conte,* 157 Conn. 209, 212, 251 A.2d 81, cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428; *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585; *State* v. *Joseph,* 96 Conn. 637, 639, 115 A. 85. There is no requirement that the state must produce expert testimony to sustain a conviction where the defense of insanity has been raised. *State* v. *Kenyon,* supra. The court was entitled to disregard the opinions of the defendant's experts and to adopt the testimony offered by the state. From all the evidence the court could reasonably decide (1) that the defendant, at the time of the commission of the homicides, had mind and capacity, reason and understanding enough to enable him to judge the nature, character and consequences of the acts charged against him and to realize that the acts were wrong and criminal and that the commission of them would properly and justly expose him to penalties and (2) that his mind was not so diseased or abnormal as to render him incapable of resisting an impulse to do an otherwise criminal act. *State* v. *Pastet,* 152 Conn. 81, 84, 203 A.2d 287. The court was justified in finding the defendant guilty of murder in the first degree on each of the six counts of the indictment.

The defendant also contends that the trial court's imposition of the death penalty upon him, pursuant to §§ 53-10 and 54-100 of the General Statutes, vio-

lates the eighth and fourteenth amendments to the constitution of the United States in that it constitutes cruel and unusual punishment.[2] The great weight of judicial authority rejects the view that capital punishment per se is cruel and unusual punishment. *Trop* v. *Dulles,* 356 U.S. 86, 99, 78 S. Ct. 590, 2 L. Ed. 2d 630; *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459, 463, 67 S. Ct. 374, 91 L. Ed. 422; *Wilkerson* v. *Utah,* 99 U.S. 130, 134, 25 L. Ed. 345; *Roberts* v. *United States,* 391 F.2d 991, 992 (D.C. Cir.); *In re Anderson,* 69 Cal. 2d 613, 630, 447 P.2d 117; 21 Am. Jur. 2d, Criminal Law, § 598; 24B C.J.S. 555, Criminal Law, § 1978 (b) (2). In *Trop* v. *Dulles,* supra, the United States Supreme Court discussed the relationship of the death penalty to the eighth amendment and stated: "Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty. . . . The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. . . . The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending

---

[2] The eighth amendment is applicable to the states through the fourteenth amendment. *Robinson* v. *California,* 370 U.S. 660, 666, 82 S. Ct 1417, 8 L. Ed. 2d 758.

upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect."

The defendant, nevertheless, urges that through disuse capital punishment has become a sacrificial anachronism in the American legal system and that by virtue of the eighth amendment to the constitution of the United States the state no longer has the constitutional power to take the life of a convicted criminal. Although the penalty of death may now be inflicted less frequently, as of the end of 1967, thirty-seven states, the District of Columbia and the federal government continued to authorize by statute the infliction of the death penalty for the crime of murder.[3] In the same year, seventy-four persons were sentenced to death for the crime of murder.[4] Thus, the death penalty remains an accepted method of punishment, even though it is less frequently used.

To adopt the argument of the defendant would require this court to vitiate what is an inherently legislative determination that the death penalty is an appropriate mode of punishment for the crimes enumerated in General Statutes § 53-10. See *People v. Tanner*, 3 Cal. 2d 279, 298, 44 P.2d 324; comment, 79 Harv. L. Rev. 635, 639. In the legislative sessions of 1961, 1963, 1965, 1967 and 1969, the General Assembly specifically declined to abolish the death penalty in this state. It is the conclusion of this court that the death penalty does not constitute

[3] Four other states authorize the death penalty for a murder committed under certain circumstances, and nine states have abolished capital punishment outright. U.S. Dept. of Justice, Bureau of Prisons, National Prisoners Statistics Bul. No. 42 (June, 1968), Tables 15 and 16, pp. 30–32.

[4] U.S. Dept. of Justice, Bureau of Prisons, National Prisoners Statistics Bul. No. 42 (June, 1968), p. 1.

cruel and unusual punishment in violation of the eighth amendment to the constitution of the United States.

There is no error.

In this opinion the other judges concurred.