STATE OF CONNECTICUT *v.* ROBERTO DELGADO

HOUSE, C. J., THIM, RYAN, FITZGERALD and KLAU, Js.

Argued June 3—decided November 23, 1971

*James D. Cosgrove,* public defender, for the appellant (defendant).

*John D. LaBelle,* state's attorney, with whom, on the brief, was *George D. Stoughton,* chief assistant state's attorney, for the appellee (state).

HOUSE, C. J. Roberto Delgado was found guilty, by a statutory three-judge court, of murder in the first degree in the killing of a Hartford police officer,

Harvey R. Young, who was taking him to the police station after arresting him. The court imposed the death penalty. That the defendant shot and killed Officer Young was established by a veritable parade of eyewitnesses, as the homicide was observed by several passengers of a Connecticut Company bus which happened to be passing the scene of the slaying. On his appeal, however, the defendant has raised several technical and substantive issues and asserted the claim that the state failed to prove beyond a reasonable doubt that he was guilty of murder in the first degree.

Two of the reasons for appeal require but little comment and we note these first.

After the indictment by the grand jury and before the trial the defendant moved to quash or dismiss the indictment on the grounds that he was not permitted to have counsel present with him at the hearing before the grand jury and was not permitted to have a stenographer present to record the grand jury proceedings. There was no error in the ruling of the trial court denying the motion. We have reiterated in several recent cases that a defendant has no right to have counsel present in the grand jury room. *State* v. *Vennard,* 159 Conn. 385, 390, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625; *State* v. *LaBreck,* 159 Conn. 346, 347, 269 A.2d 74; *State* v. *Stallings,* 154 Conn. 272, 282, 224 A.2d 718. Because of a recent ruling on the subject by a judge of the Superior Court and to provide, so far as possible, uniformity in the administration of justice in the state, we take this occasion expressly to reaffirm the law on this point as stated in the opinions in the above-cited cases. It is the general practice in most states not to require a stenographic record of the grand jury

proceedings; 38 C.J.S., Grand Juries, § 44; and it is not required under the Federal Rules of Criminal Procedure. *United States* v. *Caruso,* 358 F.2d 184 (2d Cir. 1966), cert. denied, 385 U.S. 862, 87 S. Ct. 116, 17 L. Ed. 2d 88. In *State* v. *Vennard,* supra, we noted that, in view of the very limited purpose of the grand jury and the requirement of secrecy as to its deliberations, "we see no reason to permit a defendant to jeopardize that secrecy by recording in writing or otherwise what transpires merely for the purpose of making such an investigation a more effective tool for discovery." There is no constitutional or statutory right to have a stenographer present in the grand jury room and we find no error in the refusal of the trial court to permit it in this case.

The defendant testified as a witness in his own defense and on cross-examination the state's attorney, for the purpose of attacking his credibility, introduced evidence that the defendant had previously been convicted of several felonies. The evidence was admitted over the objection of the defendant that to admit the evidence was tantamount to requiring the defendant to incriminate himself. It was clearly admissible under the specific provisions of General Statutes § 52-145. In *State* v. *Marquez,* 160 Conn. 47, 273 A.2d 689, we recently discussed this statute and the authorities on this issue and there is no need to repeat what we said there. There was no error in this ruling of the trial court.

We turn now to the claim of the defendant that the state failed to prove beyond a reasonable doubt that the defendant was guilty of murder in the first degree. In testing this claim we examine such exhibits as are made a part of the record and the evidence which has been printed in full in a joint

appendix filed by the state and the defendant. *State* v. *Hassett,* 155 Conn. 225, 232, 230 A.2d 553; *State* v. *Hodge,* 153 Conn. 564, 572, 219 A.2d 367; *State* v. *Davis,* 153 Conn. 228, 229, 215 A.2d 414. We are also aided by the unattacked finding which the court filed to show the conclusions of the court as to the facts found. It is unnecessary to summarize all of the evidence but the facts relevant to the ultimate conclusions of the court are material and these we note: On the afternoon of August 25, 1967, Delgado went to the home of Elena Dieppa, at 184 Newfield Avenue in Hartford. Mrs. Dieppa asked one of her sons to call the police when Delgado came to her home and she left the house when he came there. As a result of the call Officer Young was dispatched by radio to go to the Dieppa home in his police cruiser. He was in uniform as a member of the Hartford police department. When Officer Young went to the front door of 184 Newfield Avenue Delgado ran out the back door. Officer Young called to him and Delgado came back and both men then sat in the front seat of the police cruiser. It was raining hard at the time. Officer Young asked Delgado his name; Delgado said his name was Johnny. A young son of Mrs. Dieppa was standing near the cruiser and told Officer Young that the defendant's name was Roberto Delgado and that there was a warrant out for his arrest. Officer Young then called the Hartford police department by radio to inquire if there was a warrant outstanding for the arrest of Delgado. The dispatcher at police headquarters notified Officer Young by radio that there was a warrant outstanding for the arrest of Delgado for breach of the peace, that in fact there was an unexecuted warrant in the active warrant file at the Hartford police station which subsequently was served and executed on Sep-

tember 8, 1967, when the defendant was taken from the Hartford Hospital. When Officer Young learned of the outstanding warrant he placed Delgado under arrest and the Dieppa boy told Delgado in Spanish that the policeman said he was under arrest. Officer Young then drove away from Newfield Avenue with Delgado in the front seat of the cruiser with him. He was headed for police headquarters with Delgado and so notified the dispatcher. While the officer was driving, Delgado grabbed the steering wheel and Officer Young stopped the cruiser on Overlook Terrace, across the street from the Charter Oak Terrace community center building. A Connecticut Company bus drove past the police cruiser just after it stopped and the passengers observed Officer Young and Delgado struggling in the cruiser. The struggle continued outside the cruiser and in the street, with the officer trying to get Delgado back into the cruiser. As the struggle continued, Officer Young used his blackjack on Delgado and Delgado obtained possession of the officer's nightstick and was swinging it at the officer, hitting him with it. The struggle continued in the street with both men wrestling each other on the ground. Officer Young fell on his back in the middle of the road with Delgado on top of him. Officer Young seemed to be in a helpless position and called for assistance. He tried to draw his gun, both men struggled for it and one shot was fired, hitting Delgado in the chest. Delgado then struck Officer Young several times on the head with the nightstick and took his gun. Officer Young then rolled over onto his stomach and crawled from the position where he had been on his back in the middle of the road to the curb, a distance of at least eighteen feet, where he collapsed. He was lying still, face down with his feet over the curb, when Delgado

stood at his feet, bent forward and fired at Officer Young's head with the revolver, the weapon being no more than one foot from the officer's body. Delgado shot Officer Young in the back and head four times and continued to fire the gun until it clicked but did not fire. Delgado then ran across the street to the police car, threw in the gun and tried to drive off. When the cruiser stalled Delgado jumped out of the car and ran behind some buildings and into an apartment where he was subsequently apprehended.

On the issue of the guilt of the defendant no evidence whatsoever was introduced that he was not a person of sound reason and judgment and no defense of insanity was raised. The court concluded that the defendant had been placed under arrest by Officer Young; the defendant was in the custody of the officer at the time the struggle between them commenced; that he had been arrested on a valid warrant and knew that he was under arrest; that the struggle between the defendant and Officer Young had ended in the middle of the road; that Officer Young had crawled to the curb where he collapsed on his stomach after which Delgado, at close range, fired the shots which killed him; and that the killing of Officer Young by Delgado was wilful, deliberate, premeditated and with malice aforethought.

The defendant has advanced the claim that because Officer Young did not have the arrest warrant in his hand to read to Delgado his arrest was not legal and Delgado had the right to take all reasonable steps to remove himself from custody. So far as the arrest is concerned, we find no error in the conclusion of the court that the arrest was legal. It was made pursuant to a valid arrest warrant on file at police headquarters and before placing Delgado

under arrest, Officer Young verified the existence of the warrant and the identity of Delgado as the person named in it. There is substantial authority for the rule that an officer making an arrest pursuant to a warrant must actually have the warrant in his possession at the time of the arrest. See 6 C.J.S., Arrest, § 4 (c). This rule appears to have evolved in the nineteenth century, when communication was only possible in person or by letter, so there was good reason to require the arresting officer to have the warrant in his possession. See *Commonwealth* v. *Cooley,* 72 Mass. (6 Gray) 350, 356–57; *Galliard* v. *Laxton,* 121 Eng. Rep. 1109, 2 B. & S. 363, 371–73; *Codd* v. *Cabe,* 1 Ex. D. 352, 356–57. The rule, however, makes little sense in today's world of organized police departments and radio police communications and we decline to follow it. "It is a well settled rule that the law varies with the varying reasons on which it is founded. This is expressed by the maxim, *'cessante ratione, cesset ipsa lex.'* This means that no law can survive the reasons on which it is founded. It needs no statute to change it; it abrogates itself. If the reasons on which a law rests are overborne by opposing reasons, which in the progress of society gain a controlling force, the old law, though still good as an abstract principle, and good in its application to some circumstances, must cease to apply as a controlling principle to the new circumstances." *Beardsley* v. *Hartford,* 50 Conn. 529, 541. In these days of large urban populations it is obviously impractical for every police officer to have personal possession of every warrant for the arrest of fugitives from justice. As Mr. Justice Harlan observed in *Whiteley* v. *Warden,* 401 U.S. 560, 568, 91 S. Ct. 1031, 28 L. Ed. 2d 306, where the arrest was made on the strength of a radio bulletin:

"Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause." We see no reason to require that when a police officer discovers the presence of a person for whose arrest a warrant has been issued and has verified the existence of the warrant and the identity of the fugitive the officer must speed back to police headquarters to pick up the warrant and then return with the warrant to search for the fugitive. Rather, as in the present case, he should apprehend the fugitive and then, as expeditiously as possible, take him to the police station where the warrant can be read to him. The Federal Rules of Criminal Procedure have expressly codified this principle into the provisions of rule 4 (c) (3) that an arrest warrant shall be executed by the arrest of the defendant and "[t]he officer need not have the warrant in his possession at the time of the arrest, but upon request he shall show the warrant to the defendant, as soon as possible." As the comment to that rule says: "It is obviously impossible for a warrant to be in the possession of every officer who is searching for a fugitive or who unexpectedly might find himself in a position to apprehend the fugitive." 8 Moore, Federal Practice (2d Ed.) ¶ 4.01, pp. 4-2, 4-4. This practical rule is urged by the American Law Institute (A Model Code of Prearraignment Procedure, art. 3, Arrest § 3.03) and the American Bar Foundation (The Administration of Criminal Justice Series, Arrest, p. 281). For cases supporting the principle, see *In re Kosopud,* 272 F. 330, 336 (D. Ohio); *People* v. *Jeffries,* 31 Ill. 2d 597, 203 N.E.2d 396; *State* v. *Pettit,* 20 Ohio App. 2d 170, 173, 252

N.E.2d 325. We find no error in the conclusion of the trial court that the defendant's arrest was a legal arrest.

It is also not without significance that at his trial the defendant made no claim whatsoever that his assault upon Officer Young was triggered by the circumstance that he had been placed under arrest or that the officer did not have the arrest warrant in his possession at the time of the arrest. According to his testimony, his fight with Officer Young was precipitated when Young stopped the cruiser, grabbed the defendant by the shirt, pulled him out of the car and struck him.

In any event, and whatever the cause of the fight between Officer Young and the defendant, it appears that the physical combat between them ended on the ground in the road when the officer, in a helpless position, called for assistance. It was at this point that both men were struggling for the gun, one shot was fired, hitting Delgado in the chest and Delgado then struck the officer several times on the head with the nightstick and took the gun from him. Officer Young then rolled over onto his stomach, crawled from where he had been on his back in the middle of the road to the curb and collapsed, lying still, face down with his head on the grass plot and his feet over the curb out into the road. It was at this point and with Officer Young in this helpless condition that Delgado followed him to the curb, stood at his feet, bent forward and emptied the gun into his head and back.

It is the claim of the defendant that this evidence did not establish that the death of Officer Young was due to wilful, deliberate and premeditated intent on the defendant's part, although he properly concedes that the question of the existence of the required

mental state is a question of fact to be resolved by the trier. Admittedly, the events leading up to the fatal shooting of Officer Young occurred in a very short space of time but the length of time which elapses between the formation of a specific intent to kill and the fatal act is not the test. "The question is whether the court could reasonably conclude that there was sufficient time to enable the mind of the defendant to conceive a wilful, deliberate, premeditated intent to kill before the act was done." *State* v. *Malm,* 142 Conn. 113, 118, 111 A.2d 685. For murder in the first degree, "[t]he statute requires the killing to be wilful, deliberate and premeditated, and if there is sufficient time to form the wilful, deliberate, premeditated and specific intent to kill before the act of killing, then the time will be sufficient, whether it was longer or shorter. The act of killing must be preceded by such wilful, deliberate and premeditated and specific intent, and if there is time enough for that, that is all that is necessary." *State* v. *Candido,* 93 Conn. 242, 246, 105 A. 442, quoting from *State* v. *Smith,* 49 Conn. 376, 389. The trial court heard the testimony of thirteen eyewitnesses to the killing and from all the evidence concluded that the killing of Officer Young by the defendant was wilful, deliberate, premeditated and with malice aforethought. The evidence amply supports the conclusion of the trial court.

A further claim of the defendant is that even though the trial court found the defendant guilty of murder in the first degree it erred in imposing the death sentence as a penalty. General Statutes § 53-10 provides that on a conviction for murder in the first degree "[t]he determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on

the evidence presented." Pursuant to the provisions of this statute the trial court had a full hearing on the question of penalty and made a finding from the evidence which it had for consideration. It concluded that the evidence on this aspect of the case relative to the medical and psychiatric background of the defendant was not sufficient to mitigate the penalty of death. Considering all the evidence, including the ferocity of the defendant's attack on a uniformed policeman whom he had already rendered helpless, it cannot be said the trial court abused the broad discretion vested in it by § 53-10.

The assertion of the defendant, that the provisions of § 53-10 violate the due process requirements of the constitution, because of the absence of standards to guide the trier of fact in determining whether or not the death sentence should be imposed, has been decided adversely to his claim by this court in *State v. Walters,* 145 Conn. 60, 71, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45, and more recently in *McGautha* v. *California,* 402 U.S. 183, 91 S. Ct. 1454, 28 L. Ed. 2d 711, decided by the United States Supreme Court while the present appeal was pending. Holding that no specific statutory standards are constitutionally required and, in fact, suggesting that the prescription of specific standards would be undesirable, the opinion by Mr. Justice Harlan stated (p. 208): "The states are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the

scope of consideration, for no list of circumstances would ever be really complete."

Another claim of the defendant is that there has been a discriminatory denial to him of a right to appeal to the Sentence Review Division of the Superior Court for a review of the sentence imposed and that this denial is arbitrary and unreasonable and denies him equal protection of the laws. General Statutes § 51-195 provides in part: "Any person sentenced to a term of one year or more in the State Prison or State Prison for Women, or committed to the Connecticut Reformatory, by any court of competent jurisdiction may, within thirty days from the date such sentence or commitment was imposed, except in any case in which a different sentence could not have been imposed, file with the clerk of the superior court for the county in which the judgment was rendered an application for review of the sentence by the review division." Since a death sentence is obviously not a sentence to a term of one year or more in any of the correctional institutions named in § 51-195, that statute does not afford to the defendant a right to have his sentence reviewed by the Sentence Review Division of the Superior Court and the defendant asserts that the result is "that a person receiving a sentence of confinement actually has a greater statutory right of appeal than one who has been sentenced to die" and the latter is accordingly denied the equal protection of the laws required by the fourteenth amendment to the federal constitution.

The requirement of equal protection of the laws does not deny a state the right to make classifications in law when such classifications are rooted in reason. "Under traditional equal protection principles, a State retains broad discretion to classify as

long as its classification has a reasonable basis." *Graham* v. *Richardson,* 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534. Although no precise formula has been developed, the United States Supreme Court has permitted the states a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393. "It is our law that where there is some natural and substantial difference germane to the subject and purposes of the legislation, there is no illegal discrimination between those within an established class and others not so included." *Franklin Furniture Co.* v. *Bridgeport,* 142 Conn. 510, 514, 115 A.2d 435. As we quoted in *State* v. *Cullum,* 110 Conn. 291, 295, 147 A. 804: "A proper classification . . . must embrace all who naturally belong to the class—all who possess a common disability, attribute or qualification and there must be some natural and substantial difference germane to the subject and purpose of the legislation between those within the class included and those whom it leaves untouched." It cannot be held that in the light of the varying seriousness of the offenses and the variance of penalties involved the state may not constitutionally differentiate in its treatment of those convicted of misdemeanors, of felonies, and of the capital offense of murder. Our state constitution itself

recognizes the special classification of those charged with murder in the requirement of § 8 of article first that "[n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or indictment of a grand jury" and the right of an accused to be released on bail "except in capital offenses, where the proof is evident or the presumption great." See *State* v. *Menillo,* 159 Conn. 264, 268 A.2d 667. We cannot hold that it is unreasonable to divide convicted persons into classifications according to the heinousness of the offenses for which they have been convicted.

The Sentence Review Division of the Superior Court, comprised of three judges of that court, was created as a result of an investigation by a prison study commission appointed by the governor to ascertain the cause of unrest among inmates of the state prison. It reported that "[a]s long as a prisoner feels that he has been denied review of a sentence which he deems unfair or unduly harsh he remains a source of trouble in the prison system and efforts toward rehabilitation are seriously impaired." First Interim Report, Governor's Prison Study Commission (Nov. 19, 1956), p. 2. The commission recommended the establishment of the sentence review procedure to enable the offender to "enter the crucial first stage of prison life with at least one less grievance and with a feeling that his sentence does not represent the bias and prejudice of a single judge." Id., pp. 9, 10; see also 69 Yale L.J. 1453, 1460. Neither of these factors is relevant to the situation of the convicted murderer. The prescribed statutory penalty for murder in the second degree is life imprisonment; General Statutes § 53-11; and there is no alternative sentence which could be imposed by the court and, hence, no

exercise of judgment or discretion which could be subject to review. In the case of first-degree murder the statutory penalty is death, as it has been since early colonial times, except that now in the discretion of the trier of the issues of fact, court or jury, the penalty of life imprisonment may be imposed. General Statutes § 53-10. If the trial is to a jury the decision as to whether or not clemency should be granted and the penalty reduced from death to life imprisonment is left to the jury. If the trial is to a court the decision as to whether clemency should be exercised is vested in the three-judge panel which comprised the trial court. §§ 53-10, 54-82. In either event, the sentence does not "represent the bias or prejudice of a single judge" and in view of the nature of the death penalty considerations of rehabilitation are not pertinent. First Interim Report, op. cit., p. 9.

As we noted in *State* v. *Walters,* 145 Conn. 60, 72, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45, the effect of what is now § 53-10 has been to transfer from the board of pardons to the trier of fact in a case where an accused has been found guilty of murder in the first degree the first power to determine that the penalty shall be life imprisonment instead of death. We find no merit to the claim of unconstitutionality on the part of the defendant.

The remaining claim of the defendant is that the imposition of the death penalty is unconstitutional on the ground that it is proscribed as "cruel and unusual punishment." This court has ruled to the contrary in *State* v. *Davis,* 158 Conn. 341, 356, 260 A.2d 587. We note that the United States Supreme Court has granted certiorari in the cases of *Aikens* v. *California, Furman* v. *Georgia, Jackson* v. *Georgia*

and *Branch* v. *Texas,* 403 U.S. 952, 91 S. Ct. 2280, 2282, 2287, 29 L. Ed. 2d 863, 864, limited in each case to the following question: "Does the imposition and carrying out of the death penalty in this case constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?" A decision from that court is, of course, controlling on a question of federal constitutional law but in the absence of such a controlling contrary decision we adhere to our decision in *State* v. *Davis,* supra, for the reasons therein stated.

There is no error.

In this opinion THIM, RYAN and FITZGERALD, Js., concurred.

KLAU, J. (dissenting). I disagree with that portion of the majority opinion which states that there was no error in the ruling of the trial court with respect to the admission of evidence of prior convictions of felonies for the purpose of attacking the credibility of the defendant. The majority opinion cites *State* v. *Marquez,* 160 Conn. 47, 273 A.2d 689, as though it had no application to this case. It is true that the defendant's objection on the ground that the evidence of the prior convictions would tend to incriminate him was ill-founded. This evidence was admissible under § 52-145 of the General Statutes and the proper ground of objection to the admission of the evidence was that the evidence of the prior convictions, should, in the exercise of the court's discretion, be excluded because its prejudicial effect outweighed its probative value. See *State* v. *Marquez,* supra, 52. Failure to state a proper ground for objection should not be controlling in a capital case in which the death penalty has been imposed. Technical infirmity in the method of rais-

ing a point in the trial court should be overlooked in a capital case in order to assure a fair trial. See *State* v. *Davies,* 146 Conn. 137, 145, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537; *State* v. *Walters,* 145 Conn. 60, 64, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45; *State* v. *Buteau,* 136 Conn. 113, 115, 68 A.2d 681, cert. denied, 339 U.S. 903, 70 S. Ct. 516, 94 L. Ed. 1332.

The four prior convictions as offered in evidence by the state were: (1) August 2, 1957, attempt to kill; (2) in 1954, aggravated assault and battery; (3) in 1955, aggravated assault and battery—all of these convictions occurring in Puerto Rico—and (4) in 1961, in the Circuit Court for the twelfth circuit, aggravated assault in South Windsor. In *State* v. *Marquez,* supra, this court said: "It is enough to say that the trial judge is the arbiter of the many circumstances which may arise during a trial in which his function is to assure a fair and just outcome. We believe that if a defendant testifies and, thereafter, evidence of a prior conviction is offered under circumstances in which its prejudicial effect far outweighs its materiality and relevancy on the issue of credibility in a criminal trial, its admissibility should be determined by the exercise of a sound judicial discretion."

None of these convictions in any way has any probative relevance on the question of credibility. They were offenses remote in time, of a violent nature, of like character with the crime with which the defendant was on trial and the prejudicial tendency of the evidence of these offenses far outweighed its probative relevancy. Whether the trial judges admitted these prior convictions in evidence in the belief that they had no discretion to exclude

them—the finding discloses the court called the attention of the defendant's counsel to *State* v. *Grady,* 153 Conn. 26, 211 A.2d 674, where an objection on the ground that prior convictions would tend to incriminate the defendant was overruled—or whether they failed to exercise their discretion in not admitting evidence of these prior convictions when it was plain that they should have done so; in either event, there has been an abuse of discretion. See *Crowell* v. *Palmer,* 134 Conn. 502, 512, 53 A.2d 729; Bowers, Judicial Discretion of Trial Courts §§ 19–20, pp. 31–41. "Discretion means 'a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates.'" *Hammerberg* v. *Leinert,* 132 Conn. 596, 604, 46 A.2d 420. I believe that the admission of these prior convictions constituted harmful and prejudicial error.

I further disagree with the majority opinion that there was no error in the conclusion of the trial court that the defendant's arrest was a legal arrest. The majority opinion states, citing 6 C.J.S., Arrest, § 4 (c), that there is substantial authority for the rule that an officer making an arrest pursuant to a warrant must actually have the warrant in his own possession at the time of the arrest. The majority opinion, nevertheless, declines to follow this authority. It does not distinguish between arrests made where warrants are outstanding for felonies and where they are outstanding for misdemeanors. It is only in a misdemeanor that a warrant must be in the possession of the arresting officer to constitute a valid arrest. This rule is supported by the over-

whelming weight of authority in the absence of statute in the state courts. See *Smith* v. *State*, 208 So. 2d 746, 747 (Miss.); 4 Wharton, Criminal Law and Procedure § 1617, p. 282; Restatement (Second), 1 Torts § 126; 1 Alexander, Arrest § 92, p. 476; 5 Am. Jur. 2d, Arrest, § 72; 6 C.J.S., Arrest, § 4 (c); Fisher, Laws of Arrest § 54, pp. 114–15; Prosser, Torts (3d Ed.) § 25.

In a felony, where there is a warrant outstanding, the arresting officer may make the arrest even though he does not have the warrant in his possession, under the general principle that an officer may make a valid arrest if he has reasonable ground for belief that a felony has been committed, or that there was probable cause for the issuance of the warrant. See *Whiteley* v. *Warden,* 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306.

Cases cited in the majority opinion of arrests made where warrants were outstanding but not in the possession of the arresting officer involved felonies, not misdemeanors. There is no great public urgency in the apprehension of criminals charged only with the commission of a misdemeanor to require the reversal of the overwhelming weight of authority, especially in a capital case where the death penalty has been imposed. At the time the defendant was placed under arrest, he had committed no crime in the presence of the officer and was not charged with the commission of a felony. The warrant at headquarters was for breach of the peace, a misdemeanor. Had he not been arrested at that time, he easily could have been arrested at a later time under the warrant, as he was not a fugitive from justice at the time and had a known place of abode. Consequently, the defendant had a right to resist the arrest. The majority opinion states

that the defendant did not raise the question of his right to resist arrest at the time of trial. In a capital case claimed error should be considered even though not assigned in order to assure a fair trial. *State* v. *Reid,* 146 Conn. 227, 235, 149 A.2d 698.

Section 54-2a of the General Statutes provides that "[a]ll process issued by the [circuit] court or any judge thereof shall be served by any proper officer, or an indifferent person when specially directed to do so, in the same manner as process issued by any other court or judge." This would seem to require, at least in a misdemeanor, that the arresting officer have possession of the warrant. The authority to make the arrest in a misdemeanor is arrived at from the command contained in the warrant. With the warrant in his possession the arresting officer is clothed with the authority of the court and is acting pursuant to its order. See *Wales* v. *Clark,* 43 Conn. 183, 186.

Subsequent events must be viewed in the light of an illegal arrest, especially in the light of the court's finding on the hearing with respect to the imposition of penalty that the defendant was an individual who had a brain abnormality which required dilantin to keep him under control; that he had not taken dilantin for more than a year prior to the date of the killing; and that he had a chronic brain syndrome.

I am of the opinion that the conclusion of the trial court that the arrest was legal constituted harmful error.

I believe that the judgment should be set aside and a new trial ordered.