STATE OF CONNECTICUT *v.* CHARLES M. GRAY
(11796)

HEALEY, DANNEHY, SANTANIELLO, CALLAHAN and SHAUGHNESSY, Js.

Argued February 5—decision released July 15, 1986

*Joseph G. Bruckmann,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Mark D. Arons,* special assistant state's attorney, with whom were *Carl Schuman,* assistant state's attorney, and, on the brief, *John M. Bailey,* state's attorney, and *Herbert Appleton,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The principal issue on this appeal is whether the trial court erred in denying the defendant's motion to suppress a confession made to a police officer after his arrest. The defendant was charged in a seventeen count substitute information arising out of a robbery in a motel room in East Windsor on January 29, 1977. After a trial to the court, *O'Donnell, J.,* the defendant was convicted of one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4), two counts of being an accessory to robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-8, two counts of being an accessory to kidnapping in the second degree in violation of General Statutes §§ 53a-94a and 53a-8, and one

count of being an accessory to burglary in the second degree in violation of General Statutes §§ 53a-102 (a) and 53a-8. The defendant received an effective sentence of not less than six nor more than twelve years. He appeals from the judgment of conviction.

The evidence adduced before the court necessary to our disposition of the principal issue was as follows: After meeting at a restaurant in East Windsor on the evening of January 28, 1977, Dorothy Mercer, Roger E. Williams, Kenneth Moule, Leonard Bancroft and Brad Baker went to the Ramada Inn in East Windsor in the early morning hours of January 29, 1977. Bancroft remained in the car in the parking lot in the back of the inn. Mercer and Williams were in a room at the motel when two black males followed Baker as he entered the room. The two males bound the three victims with tape, put a pillowcase over Williams' head, and hit Mercer on the head with a blunt object. Bancroft subsequently arrived at the room and helped the victims remove the tape. Personal property of the victims was taken by the two males including credit cards, cash, a jacket, and keys. At no time was the defendant ever identified as a participant in the incident in the motel room by the victims or anyone else.

Lieutenant Thomas J. Laufer, Sr., of the East Windsor police department investigated the Ramada Inn robbery. Laufer testified that a credit card slip, identified by Williams as being an imprint of one of his cards taken during the robbery, was obtained by the police from a gas station in Springfield, Massachusetts.

During the early evening hours of April 2, 1977, warrants were issued and executed in Massachusetts to arrest the defendant and to search his apartment and car in Springfield. Laufer accompanied Springfield police officers to the defendant's apartment. The defendant was arrested and taken into custody when

he arrived at his home at approximately 7:15 p.m. and was subsequently taken to the Springfield police station where he was charged with possession of a stolen credit card. At the police station, the defendant allegedly made inculpatory statements to Springfield police officers and to Laufer.

The defendant moved before trial to suppress any statements allegedly made by him which the state intended to use at trial. The motion, which also requested a preliminary hearing on the issue, was denied and the court stated that it would be addressed at trial. During the course of the trial, the state attempted to introduce as a full exhibit a statement allegedly made by the defendant to officer Paula Higgins of the Springfield police department. The trial court granted the defendant's motion to suppress the Higgins statement, exhibit L, because the state had failed to prove that the defendant had "voluntarily and knowingly waived his rights" prior to the taking of the statement. The defendant also moved to suppress a statement, exhibit P, that he had allegedly later made to Laufer at the Springfield police station. The motion was denied and an exception was taken. The circumstances surrounding the making of the statements must be examined in order to address the defendant's claim of error.

The defendant testified for the limited purpose of the issue of the admissibility of his alleged statements to Higgins and Laufer. He testified that two Springfield police officers, Detective Breer and Lieutenant Robert Seymour, took him from his holding cell to a "small room" upstairs and interrogated him about the stolen credit card and, after receiving no incriminating response, returned him to his cell.

On April 3, 1977, at approximately 7:30 a.m., Higgins interrogated the defendant at the crime prevention

bureau at the Springfield police department. Several police officers were present at various times during the taking of the statement, including Seymour, Breer and officer Kelly. Laufer was not present at this time. Higgins testified that the defendant had no difficulty talking to her and was not nervous, upset or threatened. She advised the defendant of his rights, including his right to consult an attorney before questioning began. She testified that he told her that he was "familiar with his rights" because he had been arrested before but that he "wanted to talk, anyway." The oral statement that he allegedly gave to Higgins was reduced to writing and later typed. The defendant refused to sign it although he allegedly initialed a correction that had been made on it.[1] The interrogation of the defendant lasted approximately forty-five minutes.

---

[1] Exhibit L contained an unsigned advisement of rights and the purported confession of the defendant given to officer Paula Higgins. Exhibit L contained the following statement:

"About two months ago on a weekend, on a Friday, I left the Y at about 8:00 after playing basketball. I got me a sandwich at the Pizza King and met Charlie Cotton and Egghead. I have know Cotton about a year and he lives on Lincoln St. I met Egghead last summer and he lives on Atwood Place. Egghead is a brown skinned dude, about 22, about 6'2" tall, about 175 pounds. He has a medium afro & a mustache.

"We rode around in my Cougar, Cotton, Egghead and I, and we were talking. Eggie said he knew this bookie that was going to be paying this guy off. He said he was sure that my share would be at least $500 just for driving him. He said to get on 91 and head towards Hartford. It was about a twenty minute drive and Eggie showed me where to pull off and I parked straight ahead after I drove to the right of the gas station. Eggie was like hipping Cotton to it. He'd say when we come up on the guy we're going to do it then because we know he's got the money on him. They both told me to stay right here. Cotton had a brown face mask and Eggie had a small silver gun, like a .22. They told me to make sure I don't let the police come up on them. They said to flash my lights twice if the man came. I saw them take a right around the front of the Ramada Inn and they came back about 45 minutes later with a brown paper bag. Egg got in the back seat with the bag and Cotton got in the front. On the way back they said they didn't get the big package. I went to Gus Jones' and played the pinball machine. Cotton slid over and drove my car and Egg got out of the back to the front.

Higgins and Seymour testified that Seymour signed the defendant's name to a carbon copy of the statement given to Higgins and that Seymour and Breer signed as "witnesses." Seymour explained that he signed the defendant's name to the purported confession in order to "use a little subterfuge against a codefendant, that's all."[2] The statement taken by Higgins was ruled inadmissible and it was suppressed by the trial court on the basis of insufficient waiver.

The defendant, who had been in custody almost twenty-four hours, was then interrogated by Laufer at the Springfield police department on April 3, 1977, at approximately 6:30 p.m. Laufer had already been told by Higgins that day that a statement had been taken from the defendant and that the substance of the statement concerned the crimes that he was investigating. Laufer testified that he advised the defendant "of his *Miranda* warning" in a waiver that he filled out. He and Higgins witnessed the defendant sign the waiver form. The date on the form was "4/2/77," but, nevertheless, Laufer testified that it was signed on April 3, 1977, just before he took the defendant's statement. The trial court, during a colloquy on the admissibility of the waiver form, stated that the discrepancy in the dates as disclosed on the form and as testified to by Laufer was only a "clerical error" and admitted the waiver form as a full exhibit. Although the form

They said they were going to see their people and then they would be right back. It was Egg that said this. They took off and when they returned they gave me $11 and said that was my share. Egg had brought the medium size brown shopping bag with him that night.

"A couple of days after, Cotton was driving my car. [/s/] C.G.

"I let Cotton use my car the next day while I was at the Y and when he came back he had put gas in it."

[2] We note that the trial court commented: "The Court cannot condone the conduct of the Springfield Police in the subterfuge practiced upon this or any other accused person, and the Court cannot help but look with a jaundiced eye upon the testimony that it was hearing here in the court as to other matters."

on which the defendant's statement is written and Laufer's testimony indicate that the interrogation began at 6:30 p.m. and ended at 6:50 p.m., the waiver form was not signed until 6:42 p.m. Laufer explained that the defendant had been given "his rights" at 6:20 p.m. and that interrogation began at 6:30 p.m., but that neither the witness nor the defendant signed the form until 6:42 p.m. because "[t]he officer that was nearby had left." The defendant testified that the only person who advised him of his rights was Laufer. Laufer concluded the statement at 6:50 p.m., eight minutes after the defendant signed the waiver form, but the defendant refused to sign the statement.[3] Laufer testified that

---

[3] The three page statement of the defendant taken by Lieutenant Laufer, exhibit P, was as follows:

"This statement is given to Lieutenant Laufer of the East Windsor Police Department without any threats or promises being made to me. On or about the 29th of Jan. 1977, I think on a Friday night, I drove down to East Windsor, Conn. in my car, a 1974 Mercury hardtop green with Mass. registration P45-905. In the car with me was a Mike Crumps (or something like that) and a man called Egghead. I think Egghead lives at Edward Place in Springfield, Mass., he is about 6'2", 21 yrs., med. brown skin. Mike Crumps lives somewhere off of Bay St., 6'2 - 190 lbs light brown skin, his bottom lip looks bigger than the top. We drove to the Ramada Inn off of RT 91, parked the car on the side. Mike and Egghead went in to the inn to take a bookie off. This was around the time the number 666 came out. Egghead had a full face suede mask, same one that came out of my house on 4-2-77 at 9 Halsey St. Mike had a gun, I think a .22 cal., handle was brownish marble looking, the rest was silver. We talked about taking the bookie off the afternoon of 1-29-77 or thereabouts. When they went in the building at Ramada on or about Jan. 29, 1977, I stayed in the car to be a look out. I waited about 40 mins. they came back with a bag. Egghead said we didn't get a chance to get all the money, someone was in the room with him. When they came out of the Inn, Egghead pushed his hat back, part of a snorkle jacket and he had the mask on top of his head and took it off, Crump had a bag. I am not sure what was in it. They gave me $11.00 of what they got. We left and came back to Springfield, Mass. Crump sold some credit cards to Charles Cotton. One of the cards Crump sold to Cotten, Cotten had used to put gas in my car a couple of days after the Ramada Inn Robbery, this would have been some time around Jan. 31, 1977 at a BP gas station on St. James Ave. Springfield. This was a credit card in the name of Roger Williams.

the defendant raised his right hand, took an oath, and swore to the truth of the matters contained in the statement. On each page of the statement, including the first page on which he wrote the phrase himself, Laufer himself signed his name to the phrase "Subscribed and sworn to before me . . ." despite the fact that the defendant had not signed it.

The defendant's principal issue on appeal is whether the trial court erred in denying the defendant's motion to suppress his statement to Laufer. The defendant claims that the state failed to prove by a fair preponderance of the evidence that the defendant was informed of, or understood, his right to have an attorney present during questioning. He claims that the state failed to meet its burden of establishing that he knowingly, intelligently and voluntarily waived his fifth amendment privilege against self-incrimination, as required by *Miranda* v. *Arizona,* 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We first address the issue of whether the defendant was properly informed of the constitutional rights as enunciated in *Miranda* v. *Arizona,* supra. There was some testimony at trial that Seymour and Laufer advised the defendant of his "rights" at his apartment on April 2, 1977, and that the defendant informed Higgins that he had been arrested before and that he knew and understood his rights. Laufer testified that he had given the defendant all his rights before any interrogation began, although the defendant did not

---

"The above statement is true & correct. I understand that the given a false statement to a police officer in order to mislead him in his investigation a crime & I could be arrested for same. I have read this statement & will appear in court as a witness if called.

" 'Note' Suspect would not sign statement, he did swear under oath to this officer that it was true.

"Subscribed and sworn to before me at Springfield, Mass. this 3 day of April 1977.

"/s/LT Laufer"

sign the waiver form until twelve minutes into the twenty-minute interrogation. Laufer did not have the defendant sign the waiver portion of the form on which he recorded the statement but rather used a separate form dated a day earlier than when the statement was given. There was some testimony from Higgins as to the specific advisements she had given the defendant. She testified that she told the defendant that he "didn't have to talk to [her] or any other police officer, and that if he did, anything that he said can and would be used against him. . . . [He] had the right to consult with an attorney before questioning. . . . [If] he wanted, he could stop talking at any time, and he could consult an attorney. . . . [If] he didn't have the money for an attorney, the Court would appoint one." The defendant claims that Higgins' recitation of rights did not include the "significant and separate right to have an attorney present during interrogation." See *Miranda* v. *Arizona,* supra, 471.

While we recognize that *"Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures"; *California* v. *Prysock,* 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981); warnings which are a "fully effective equivalent" must be given to a defendant. *Miranda* v. *Arizona,* supra, 476. The evidence presented that indicated that warnings were given to the defendant at or around the time of his arrest never explicitly enunciated the rights allegedly given. The state, which bears the burden of proof in these matters, sufficiently demonstrated that the warnings given by Higgins, although she did not testify that she advised the defendant of his right to have an attorney present *during* questioning, and the waiver form, signed by the defendant and introduced into evidence by the state, were adequate and sufficient warnings. The defendant's claim that the *Miranda* warnings were insufficient because of Higgins' failure to inform him

of the right to have an attorney present during interrogation does not have merit under the circumstances of this case. The waiver form signed by the defendant and from which Laufer read the defendant his rights contained the explicit statement that the defendant had a right to have an attorney with him during questioning. In addition, the defendant testified that he was advised of his rights by Laufer, and Higgins testified that the defendant was aware of his rights when Seymour first read them to him prior to the time that he was taken into custody.

On the basis of the record before us, especially the testimony of the defendant that Laufer advised him of his rights, we conclude that there was sufficient evidence before the trial court to sustain its conclusion that the defendant was advised of and understood his constitutional rights.

Our next inquiry must focus on whether the defendant voluntarily, intelligently and knowingly waived his constitutional rights before making the statement to Laufer. In making this determination, "our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence." *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); see *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983). "The question of voluntariness, as often repeated, turns on the totality of the circumstances. *Boulden* v. *Hollman,* 394 U.S. 478, 480, 89 S. Ct. 1138, 1140, 22 L. Ed. 2d 433 (1969)." *United States* v. *Matthews,* 488 F. Sup. 374, 379 (D. Neb. 1980); see *State* v. *Rosa,* 170 Conn. 417, 424, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); *State* v. *Hassett,* 155 Conn. 225, 230, 230 A.2d 553 (1967).

"In order to prove that the defendant has effectively waived his privilege against self-incrimination, the state must prove, by a preponderance of the evidence; *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Wilson,* 183 Conn. 280, 286–87, 439 A.2d 330 (1981); *State* v. *Derrico,* 181 Conn. 151, 162, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); that the defendant knowingly and intelligently waived his constitutional right to remain silent. *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Waiver is not conclusively established by demonstrating that *Miranda* warnings were given and understood." *State* v. *Harris,* supra, 579–80.

We "must presume that a defendant did not waive his rights; the prosecution's burden is great . . . . " *North Carolina* v. *Butler,* supra. We must look to "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson* v. *Zerbst,* supra; see *State* v. *Williams,* 190 Conn. 104, 112, 459 A.2d 510 (1983). It must also be remembered that the defendant, who had been in custody almost twenty-four hours at the time he was interrogated by Laufer, had already been questioned by Higgins about the same robbery and that the trial court found that he had not waived his rights at that time.

The form which Laufer used to record the defendant's statement contained, on the top on the first page, an advisement of rights section with a statement of waiver. The advisements are not initialed and the "signature" line for the person being questioned is blank. Laufer, nevertheless, signed the form in the space labeled "Witnessed." The separate and unattached waiver form containing the date of "4-2-77," the time

of "6$^{42}$ pm" and the signature of "C. Gray" is clearly relied upon by the state as evidence for its claim of waiver. While there was testimony in the trial court and a conclusion by the court that the date on the signed waiver form was merely a "clerical error," our deference to the trial court's conclusion is limited by evidence which, after a scrupulous examination of the record, leads us to the finding that the defendant did not validly, knowingly and intelligently waive his rights.

The totality of the circumstances demonstrates that the defendant's statement was given at least in part before he waived his rights or signed the waiver form. Higgins, who witnessed the waiver form, was away from Laufer's desk for most of the statement and returned only after the statement was being concluded. She testified that she "thought" she signed the waiver form during the statement but she was "not positive." She did not sign as a witness to the statement, although she signed as witness to the waiver form, because "nobody asked [her] to sign it." The refusal of a defendant to sign the waiver form portion of the statement is not a "controlling" factor, but it is a relevant one. *State* v. *Derrico,* supra, 165; see *United States* v. *Cruz,* 603 F.2d 673, 675 (7th Cir. 1979). The converse of that statement is also true. The defendant's signature on the separate waiver form is a relevant, but not controlling, factor in determining the validity of a waiver. We do not find "affirmative conduct [by the defendant] indicative of a knowingly and intelligently made decision not to remain silent"; *State* v. *Harris,* supra, 581; under all the circumstances of this case. "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda* v. *Arizona,* supra, 475. The circumstances demonstrate less than tolerable treatment of constitutional safeguards, thereby compelling a find-

ing of error on the trial court's admission into evidence of the statement given to Laufer by the defendant on April 3, 1977.

The defendant claims that if we rule that his confession to Laufer is inadmissible, then "it is clear that the remaining evidence would have been insufficient to support a conviction" on any of the seventeen counts in the substitute information. The defendant specifically claims that the state did not "fully comprehend" the nature of its burden of proof under General Statutes § 53a-8,[4] the theory of liability with which the defendant was charged. The defendant concedes that, if the Laufer confession is considered to have been properly admitted into evidence, then there was sufficient evidence to support a conviction on only two counts, conspiracy to commit robbery in the first degree and accessory to robbery in the first degree. The state, at oral argument, conceded that, even if the Laufer statement were properly admitted, there was insufficient evidence to support a conviction on the sixth count, accessory to robbery in the first degree, and on the eleventh count, accessory to kidnapping in the second degree.

We disagree with the defendant's characterizations of the possible alternative dispositions of this case based upon the admissibility of the Laufer confession. We must first address the defendant's claim that the evidence was insufficient to establish the defendant's guilt beyond a reasonable doubt in the four contested counts because "if we were to rule that the evidence was insufficient, the defendant would be entitled to an

[4] General Statutes § 53a-8 provides: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

acquittal rather than a new trial. *Burks* v. *United States,* 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)." *State* v. *Ferrell,* 191 Conn. 37, 46, 463 A.2d 573 (1983).

"In determining whether the evidence is sufficient to sustain a verdict, 'the issue is whether the [trier of fact] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt.' . . ." (Citations omitted.) *State* v. *Giguere,* 184 Conn. 400, 402–403, 439 A.2d 1040 (1981). " 'In reviewing the evidence we must construe it in a light most favorable to sustaining the verdict. *State* v. *Ferrell,* supra.' *State* v. *Pellegrino,* 194 Conn. 279, 294, 480 A.2d 537 (1984)." *State* v. *Fernandez,* 198 Conn. 1, 22, 501 A.2d 1195 (1985). Under § 53a-8 a person may be prosecuted and punished as if he were a principal offender when, "acting with the mental state required for the commission of an offense, [he] solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." The defendant claims that the Laufer statement, exhibit P, is "absolutely devoid of any indication that, at the time the defendant was sitting in his car awaiting the return of his partners from their venture 'to take a bookie off,' it was his conscious objective to assist in any robberies in addition to that of the bookie." He also claims that there was no evidence either to prove that by acting as a lookout he intended to assist his partners in two kidnappings or to indicate that he had the intent to aid his partners in a robbery, including having the intent to commit burglary in order to do so, or even that a burglary had, in fact, occurred.

Exhibit P indicates that the defendant and two companions, Mike and Egghead, discussed "taking the

bookie off" on the afternoon of the subsequent robbery. The defendant drove Mike and Egghead to the Ramada Inn in East Windsor and he remained in the car to act as a lookout. Upon returning to the car, Egghead told the defendant that someone was in the room with the bookie and so they were unable to "get all the money," but he gave the defendant $11. One of Williams' credit cards stolen in the robbery was used to put gas in the defendant's car by a third party to whom Mike had sold the credit card.

Taken together, all the evidence before the trier, including the Laufer statement and the testimony of two victims, as well as the reasonable and logical inferences that may be drawn from that evidence, was sufficient to support a conviction for one count of accessory to kidnapping in the second degree and one count of accessory to burglary in the second degree. It can reasonably be inferred that the defendant, admittedly serving as a lookout during the robbery of a person in a motel, understood and intended that the individual to be robbed would probably have to be restrained by his partners in some manner in order to accomplish the robbery. It is also a reasonable and logical inference that the defendant intended to aid his partners in a burglary because it is also a logical inference that the victim would be in a room, rather than a public area of the motel. The defendant's statement includes a reference to the fact that the robbery was foiled in part because someone was "in the room" with the individual they robbed. The testimony of Williams indicates that, while he and the female victim were in the room, his friend Baker was coming to the room to get him when "somebody got him in the hallway with a gun, and . . . opened the door and came in." Regardless of whether the room was registered to any of the victims inside the room at the time of the robbery, Williams' testimony indicates that the

"intruders," as one victim called them, were not "licensed or privileged" to enter the room and therefore that their entry was unlawful as defined in General Statutes § 53a-102 (a).

We remand this case to the trial court and order that a judgment of acquittal be entered on the sixth and eleventh counts. Because we hold that there was sufficient evidence before the trial court, including the Laufer statement, to sustain the verdicts on the remaining four counts but that the admission of the confession was reversible error, we order that the judgment be reversed and the verdict set aside as to the fourth, tenth, thirteenth and fifteenth counts. The reasoning of the Supreme Court of Missouri in *State* v. *Wood,* 596 S.W.2d 394 (Mo.), cert. denied, 449 U.S. 876, 101 S. Ct. 221, 66 L. Ed. 2d 98 (1980), is relevant here. The *Wood* court said: "When the trial court erroneously admits evidence resulting in reversal, as in the instant case, the State should not be precluded from retrial even though when such evidence is discounted there may be evidentiary insufficiency. The prosecution in proving its case is entitled to rely upon the rulings of the court and proceed accordingly. If the evidence offered by the State is received after challenge and is legally sufficient to establish the guilt of the accused, the State is not obligated to go further and adduce additional evidence that would be, for example, cumulative. Were it otherwise, the State, to be secure, would have to assume every ruling by the trial court on the evidence to be erroneous and marshall and offer every bit of relevant and competent evidence. The practical consequences of this would adversely affect the administration of justice, if for no other reason, by the time which would be required for preparation and trial of every case. This is consistent with *Burks* v. *United States,* [437 U.S. 1, 15, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)], which lists among examples of trial error

which do not invoke the Double Jeopardy Clause with regard to retrial, the 'incorrect receipt or rejection of evidence.' " *State* v. *Wood,* supra, 398–9. "Double jeopardy does not automatically bar retrial [even] where an insufficiency of evidence results from material being held on appellate review to have been erroneously admitted at trial." *State* v. *Van Isler,* 283 S.E.2d 836, 838–39 (W. Va. 1981); accord, *United States* v. *Tranowski,* 702 F.2d 668 (7th Cir. 1983), cert. denied, 468 U.S. 1217, 104 S. Ct. 3586, 82 L. Ed. 2d 884 (1984); *United States* v. *Sarmiento-Perez,* 667 F.2d 1239, 1240 (5th Cir.), cert. denied, 459 U.S. 834, 103 S. Ct. 77, 74 L. Ed. 2d 75 (1982); *United States* v. *Harmon,* 632 F.2d 812, 813 (9th Cir. 1980); *United States* v. *Mandel,* 591 F.2d 1347, 1373–74 (4th Cir.), aff'd, 602 F.2d 653 (4th Cir. 1979) (en banc), cert. denied, 445 U.S. 961, 100 S. Ct. 1647, 64 L. Ed. 2d 236 (1980); *United States* v. *Block,* 590 F.2d 535, 543 (4th Cir. 1978); *People* v. *Sisneros,* 44 Colo. App. 65, 68, 606 P.2d 1317 (1980); *Mulry* v. *State,* 399 N.E.2d 413, 419 (Ind. App. 1980). Thus, where a reversal of a conviction is not a result of insufficiency of evidence but is predicated on, for example, as here, the reception of inadmissible evidence, e.g., the Laufer statement, a remand for a new trial is proper and an appellate court should not review the remaining evidence to determine whether it is sufficient to sustain the conviction. See, e.g., *United States* v. *Mandel,* supra. The underpinnings for this rule are twofold. From a defendant's point of view, if the evidence were determined to be sufficient, such appellate review would constitute an invasion of the province of the factfinder, the jury. Conversely, if the evidence were determined to be insufficient, unfairness to the state might result because the state might have produced other evidence at the trial if the evidence held inadmissible upon appellate review had been excluded

at the trial. See, e.g., *United States* v. *Mandel,* supra; *People* v. *Sisneros,* supra.

We cannot say unequivocally that with the inadmissible confession thus eliminated from the case there would be proof enough left in the record to sustain a conviction on any one or more of the four remaining counts. "In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. . . . Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence . . . . When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." *Burks* v. *United States,* supra, 15. Because we cannot say that the state will be unable to meet its burden of proof without reference to the inadmissible confession, we do not exclude a retrial.[5] See, e.g., *State* v. *Boone,* 284 Md. 1, 17, 393 A.2d 1361 (1978); *State* v. *Van Isler,* supra, 839.

---

[5] At the trial, while the state's witness Laufer was testifying, the admissibility of the defendant's statement taken by Laufer was being argued. The state at that time said: "I can't proceed if it's [the statement] not in evidence." Whether this meant, and it was not developed, that the state had no case at all against the defendant if the Laufer statement were suppressed or whether it was merely an adversarial declaration by the state, we cannot say with certitude. "It is impossible to know what additional evidence [if any] the [state] might have produced had the faulty evidence been excluded at trial, or what theory the [state] might have pursued had the evidence before the [court] been different. *United States* v. *Mandel,* 591 F.2d 1347, 1373–74 (4th Cir.), [aff'd,] 602 F.2d 653 (4th Cir. 1979) (en banc) [cert. denied, 445 U.S. 961, 100 S. Ct. 1647, 64 L. Ed. 2d 236 (1980)]; *United States* v. *Block,* 590 F.2d 535, 544 n.12 (4th Cir. 1978)." *United States* v. *Harmon,* 632 F.2d 812, 814 (9th Cir. 1980). In any event, we cannot consider it as a confession by the state at the trial that it had no case, in law or fact, against the defendant if the trial court suppressed the Laufer statement.

There is error, the judgment is set aside and the case is remanded with direction that a judgment of acquittal be entered on the sixth and eleventh counts and for further proceedings in accordance with this opinion on the fourth, tenth, thirteenth and fifteenth counts.

In this opinion DANNEHY, CALLAHAN and SHAUGHNESSY, Js., concurred.

SANTANIELLO, J., concurring in part and dissenting in part. I agree with the court that there was insufficient evidence to sustain the defendant's conviction on the sixth and eleventh counts. I must, however, respectfully disagree with the court's finding that the defendant did not voluntarily, intelligently and knowingly waive his constitutional rights before making his confession to Laufer. The record clearly supports the trial court's finding that the defendant expressly agreed to give the statement and thereby implicitly waived his *Miranda* rights. I therefore would find the confession admissible and would sustain the defendant's conviction on the remaining four counts.

There are ordinarily three means by which a defendant can waive his right to remain silent under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *North Carolina* v. *Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979): he can execute a *written waiver* of his rights, he can make an express *oral statment of waiver,* and he can *implicitly waive* his right to remain silent by exhibiting affirmative conduct indicative of a knowingly and intelligently made decision to give a statement. *North Carolina* v. *Butler,* supra, 374. We have held many times that where a defendant expressly agrees to give a statement, such conduct may constitute an implicit waiver of his *Miranda* rights. *State* v. *Shifflett,* 199 Conn. 718,

733, 508 A.2d 748 (1986); *State* v. *Toste,* 198 Conn. 573, 583, 504 A.2d 1036 (1986); *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

The majority found that "there was sufficient evidence before the trial court to sustain its conclusion that the defendant was advised of and understood his constitutional rights" but went on to hold that there was insufficient evidence to support the court's finding that he waived his rights. The majority focused its waiver analysis on the validity of the written waiver and concluded that because the written waiver was not executed until halfway through the confession, there was, under the totality of the circumstances, insufficient evidence of waiver. The court did not fully address the question of an implied waiver, and it summarily concluded that there was no affirmative conduct evidencing a "knowingly and intelligently made decision not to remain silent." In analyzing the issue, the majority has failed to explain that the trial court based its finding of waiver on the defendant's affirmative conduct expressly agreeing to speak with Laufer, and not on the written waiver.[1] The majority thus has misperceived the issue and has overlooked the evidence on the record which supports the trial court's conclusion.

[1] It was argued to the trial court that the defendant had orally waived his right to remain silent and that his expressed willingness to speak constituted an implied waiver. The trial court admitted the confession on these grounds stating: "The Court concedes that the time varied, in that Mr. Gray had set the time between 5:00 and 6:00 a.m. on April 3rd, but he did agree to another fact as to evidence which the Court had before it, the testimony of Chief Laufer, and also of Officer Higgins, that *he did waive his rights, he waived them and agreed to talk with Chief Laufer on a limited subject; namely, the credit card situation.* Officer Higgins testified to this fact, as did Chief Laufer and Mr. Gray." (Emphasis added.) The court further stated: "The defects in the form of the waiver; namely, the date and time, are satisfactorily explained by examining the totality of the testimony. Further, the Court is of the opinion that the resolution of this matter does not stand or fall on this issue. *The Court has been unable to find any law to support*

Regardless of the validity of the written waiver, the record reveals that the defendant implicitly waived his right to remain silent by his expressed willingness to speak. The defendant himself took the stand at the suppression hearing and stated: "[A]nd [Laufer] said before he asked me any questions concerning these credit cards, I had to sign a waiver, you know, to be able to talk to him. *And I told him I didn't mind talking* about any credit cards, because I didn't know. He asked me, he want[ed] to know who used the card. And at that time, I signed the waiver of my rights, while I [was] there, talking to him . . . . " (Emphasis added.) Later he also stated: "[Laufer] told me that I didn't have to talk to him, and he showed me a piece of paper. He said it was an affidavit. He said, 'Before I can talk to you, you have to sign this, for the limited purpose of me asking you about, you know, the credit cards.' He said he wanted it to be legit, and then, *that's when I volunteered,* and signed the paper." (Emphasis added.) When Laufer testified, it became clear that the defendant had signed the written waiver halfway through the confession, but it was emphasized that the defendant had expressly agreed to give the statement and waive his rights. Laufer, when questioned about why the waiver was signed in the middle of the confession, explained: "I felt at that time I wanted the time he signed it, acknowledging this, as well, in front of somebody else. *He had already acknowledged it to me.*" (Emphasis added.)

Thus, although I agree with the majority that the procedures employed in obtaining the second confes-

---

*a conclusion that Miranda warnings of rights and waiver has to be in writing.* The State has the burden, and a heavy one, I might note, of establishing the accused person was given his rights; that he knowingly and voluntarily waived these rights. The State rightfully has a heavy burden, and the Court concludes that the State has sustained this burden, as it applies to the admissions made in an unsigned statement by Charles Gray while in custody." (Emphasis added.)

sion were less than exemplary, I am constrained to hold that there was more than sufficient evidence to find that the defendant waived his right to remain silent. The record clearly shows that the defendant expressly desired to give a statement, and that he implicitly waived his *Miranda* rights. My conclusion is buttressed by the fact that this issue was not seriously pressed on appeal. The defendant, obviously acknowledging his own testimony at the suppression hearing, did not dispute that the evidence on the record supported a finding of implicit waiver, but instead argued that cases such as *State* v. *Harris,* supra, could be distinguished on the ground that in those cases a "more complete" *Miranda* warning was given.

The defendant was fully apprised of, understood and freely waived his right to remain silent. I therefore concur with the court that a judgment of acquittal should be entered on the sixth and eleventh counts, but dissent from the court's judgment reversing the defendant's conviction on the fourth, tenth, thirteenth and fifteenth counts.