[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this amended petition for writ of habeas corpus, the petitioner claims that he is being confined illegally.
On November 16, 1966 after a trial to a three judge panel, the panel found the petitioner guilty of six counts of murder in the first degree. The conviction and sentence were affirmed on direct appeal. State v. Davis, 158 Conn. 341
(1959). On petition for writ of certiorari to the United States Supreme Court, the court vacated the sentence as a result of the decision of Furman v. Georgia and ordered the petitioner to be resentenced. Davis v. Conn., 408 U.S. 935
(1972). Thereafter on November 16, 1972 a different three judge panel of the Superior Court sentenced the petitioner to serve six consecutive life terms. No appeal or review of the sentence was filed. The sentence was imposed under the provisions of Connecticut General Statute 53-10 (Rev. to 1971).
He now seeks by this writ of habeas corpus to 1, be granted a new trial or 2, be granted a new sentencing hearing or 3, reinstate his right to appeal his sentence to the sentence review board.
The facts leading up to his conviction and sentencing, as stated in State v. Davis 158 Conn. 341, are as follows:
 For about four years prior to August 23, 1966, the defendant had lived in a common-law relationship with Gloria Baskerville, commonly known and hereinafter referred to as Fanny Baskerville. They had two children, and two other children of Miss Baskerville lived with them. On Tuesday, August 23, 1966, the defendant went to work on the midnight shift and returned home shortly after 8 o'clock Wednesday morning, August 24. His two children, the younger being a month old, were with his mother, the defendant's common-law wife having left the home sometime early Wednesday morning. The defendant then went out to CT Page 7698 look for Fanny. He visited the house of her sister Leatrice McClure on two occasions that day. He asked Leatrice for the addresses and telephone numbers of her sister Katherine Anderson and her brother, John McClure, both of whom lived in Jersey City, New Jersey. He then decided to drive to New Jersey to find out if Fanny was staying there with her relatives. He put a shirt and pants in the car, together with a carbine and a pistol. He visited the homes of two of Fanny's relatives in Jersey City. He talked to Rosalind Anderson, who is Fanny's niece, shortly after noon on Wednesday, at 488 Ocean Avenue, Jersey City. The defendant kept asking her if she knew where Fanny was and if Fanny had telephoned. He also asked if he could look around the house to see if Fanny was there, and, upon receiving permission, he did so. Upon coming out of the house, he took a rifle and a pistol from the car and put them in the trunk of the car. He had a brown sweater over his shoulder.
 The defendant returned to New Haven the same day, and at 10 p. m. he visited the home of Fanny's sister-in-law, Gwendolyn McClure, still seeking Fanny. After that he drove around in his car and visited two taverns. At 3 a.m. Thursday, August 25, he went back to the residence of Leatrice McClure, again inquiring about Fanny. Leatrice said to the defendant: "If someone aggravates you about my sister leaving you, you will hurt somebody, won't you?" He said "Yes." Although Leatrice knew where her sister was, she refused to tell the defendant because she was afraid he would injure her. On August 25, at about 9 p. m., the defendant came again to 16 Northeast Drive, where Leatrice McClure resided with her mother, Mrs. Mary McClease, her grandmother, Mrs. Alice Pelham, her sisters, Charmaine McClease and Francine McClease, a brother, Royal McClease, and her daughter, Leronda McClure. The defendant asked Leatrice if Fanny had called and inquired of her mother, Mary McClease, concerning Fanny. He said, "I'll see you later," and left the house.
 During the time that the defendant and Fanny lived together he struck her frequently. On one occasion, when she was three months' pregnant, he choked her. On another occasion he struck her, choked her, threatened her with the pistol, and told her he ought to blow her brains out. There CT Page 7699 were times when he would take the carbine out, play with it and point it at her. On these occasions he always used to say: "Well, if I have to use this — shoot anyone — I'm going to take a whole lot with me." He did not like Fanny's family and said that her family was not worth anything. On the night of August 25, the defendant was with James Powell, Jr., at the Monterey Restaurant between 8:30 and 9 p. m. In the course of their conversation, the defendant told Powell that he was going to hurt someone tonight."
 The apartment located at 16 Northeast Drive consists of a living room and a kitchen with a utility closet on the first floor. The second floor contains four bedrooms and a bathroom. Shortly before midnight on Thursday, August 25, the defendant drove up in a Chrysler car and stopped. He got out of the car and walked into the courtyard toward 18 Northeast Drive, carrying a carbine held down by his right side. A shot was fired, and the defendant came out of the yard and said he had shot a dog. He then got back in his car and sat there for about a minute. After that he went to the trunk of the car, took out a brown sweater, got back in the car and sat there for about another minute. He then left the car with the brown sweater wrapped around the carbine and walked in the direction of 16 Northeast Drive, where the McCleases lived. The defendant entered the apartment shortly after midnight. When he entered, Leatrice McClure was standing near the stove over Mrs. Carolyn Sykes, who was sitting in a chair. Leatrice was doing Carolyn's hair. The defendant lifted the carvine, pointed it at Mrs. Mary McClease and shot her. The defendant did not say anything, and no one had moved. Mrs. McClease had been sitting in a chair in the kitchen by the radiator. After he shot Mrs. McClease, the defendant looked over at Neal White, who was seated at the kitchen table in front of Mrs. McClease. He then shot White, who fell out of the chair. White was a friend of Mrs. McClease and had just driven her to New Haven from North Carolina. After shooting White, the defendant shot the dog which had crawled over to him and looked up at him. The defendant then lifted the carbine and pointed it at Leatrice McClure and Carolyn Sykes. As he fired, Leatrice fell to the floor pretending she was shot. Carolyn started to run toward the utility closet CT Page 7700 and was shot by the defendant. The defendant then went upstairs and shot Francine McClease and Richard Leathers. He also shot Michael Sykes. Michael's body was found in the living room. Mary McClease, Neal White, Michael Sykes, Carolyn Sykes, Richard Leathers and Francine McClease died from gunshot wounds. Three of the victims had been shot once. Each of the other three had two bullet wounds.
 After the shootings the defendant changed his trousers and left the house, carrying the carbine straight up and down and swinging it as he walked. The brown sweater was in his hand around the carbine. The defendant was not running. He walked at the same pace at which he walked when he entered the house. He put the carbine in the trunk of the car, sat in the car for almost a minute, and then drove off. He drove the car down Dixwell Avenue and Broadway and went through four or five red lights. He was apprehended in New Jersey after pursuit by New Jersey state troopers which began on the New Jersey Turnpike near Passaic at about 3:40 a.m. on August 26, 1966, and continued for some forty-eight miles at speeds which reached eighty miles per hour. As one of the officers opened the door of the defendant's car, the defendant reached for his pistol, which was fully loaded and had a cartridge in the chamber. On the floor of the front seat on the right side was a carbine, fully loaded, with a cartridge in the chamber. A spent .30-caliber cartridge was found on the rear seat of the vehicle behind the driver, and a box of .30-caliber cartridges was on the floor beneath the carbine. It seems obvious that the carbine had been reloaded after the shootings occurred.
State v. Arthur Davis, 158 Conn. at 346-50.
As a basis for the relief sought the petitioner makes the following claims:
1. He was deprived of his liberty without due process of law in violation of the Connecticut Constitution, Article I, Section 8, and the Fourteenth Amendment to the United States Constitution as he did not have the effective assistance of counsel at trial or on appeal.
2. The evidence adduced at his trial was not, as a matter of constitutional law, sufficient to enable a rational CT Page 7701 trier of fact to find proof beyond a reasonable doubt that at the time of the killings he was legally sane and was capable of acting in a wilful, deliberate and premeditated manner with malice aforethought.
3. He was denied the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution in that because of his economic circumstances he was represented at trial and on appeal by the Office of the Public Defender of the County of New Haven, which lacked the resources to represent him effectively, in a manner comparable to private counsel.
4. He was denied a fair trial, as guaranteed by the Connecticut Constitution, Article I, Section 6, and the United States Constitution Amendment XIV, in that the police abused an important defense witness named Franklin Dunhum, and obtained from that witness, under duress, a false statement which was introduced at trial to contradict the witness's crucial testimony.
5. His sentence is excessive and constitutes cruel and unusual punishment, in violation of the Eight and Fourteenth Amendments to the United States Constitution, as it does not take due account of his mental, emotional and psychological condition at the time of the killings and punishes him for the disease of alcoholism.
The Respondent raises the following defenses to the petition for writ of habeas corpus:
1. To the extent that the Petitioner did not raise the claims asserted in this complaint in a timely fashion during his criminal proceedings, petitioner has not alleged, nor can he demonstrate "cause" for his procedural default or "prejudice" resulting from that default. Habeas corpus review is, therefore, unwarranted.
2. The Petitioner has abused the writ of habeas corpus by failing to raise the claims asserted in the original petition until nineteen years after the conviction challenged in this instant case.
3. The Petitioner has abused the writ of habeas corpus by failing to raise the claims asserted-in the Fourth Amended Revised Petition until twenty-three years after the conviction challenged in this instant case.
4. By not raising the instant claim in an earlier petition, CT Page 7702 the petitioner has abused the writ of habeas corpus.
5. Buy raising claims already addressed by the Connecticut Supreme Court, the petitioner has not presented claims cognizable in a petition for writ of habeas corpus.
6. By not filing a timely petition for new trial, the petitioner has not presented claims cognizable in a petition for writ of habeas corpus.
The claims of the Respondent will first be addressed.
The Respondent has briefed the claimed defenses under the following four general categories:
 1. Having failed to present the present allegations in an earlier petition, the petitioner's present action constitutes an abuse of the writ of habeas corpus.
 2. The petitioners' extraordinary delay in filing the instant petition precludes habeas corpus relief.
 3. The petitioner has failed to establish sufficient "cause" or "prejudice" to warrant belated review of his claims which do not allege ineffective assistance of counsel.
These claims will be considered seriatim:
1. THE RESPONDENT'S CLAIM THAT HAVING FAILED TO PRESENT THE PRESENT ALLEGATION IN AN EARLIER PETITION, THE PETITIONER'S PRESENT ACTION CONSTITUTES AN ABUSE OF THE WRIT OF HABEAS CORPUS.
The leading case in Connecticut regarding abuse of the writ of habeas corpus arising out successive petitions is Negron v. Warden, 180 Conn. 153, 429 A.2d 841 (1980). The Negron court held in part as follows:
 "The language of Section 531 is clear on its face and prescribes that trial courts may dismiss a second application without a hearing only if that application asserts the same grounds and fails to state new facts of offer new evidence not reasonably available to the petitioner at the hearing on his previous application. The necessary implication of this prescription is that if different grounds are asserted, a hearing on the CT Page 7703 second application is indicated. It is also clear that in this context `ground' must be a `sufficient legal basis for granting the relief sought.'"
Negron at 158.
In Negron a first petition was filed addressing the legality of the petitioner's arrest under an extradition warrant and unsuccessfully challenging the authority of New York to receive him into custody. A second petition was filed claiming that Connecticut, because of alleged violations of its own statutes and court rules, was barred from surrendering the petitioner to New York authorities. In overruling the respondent's claim that each application relied on the same ground, the court at page 164-165 held in part as follows:
 "Such a definition and the defendant's assertion would confuse `around' with both the legal argument underlying the ground in this case and the factual allegations that form the basis of the underlying legal argument.
 "In the second application a completely different legal effect is being ascribed to the entry of the nolle prosequi. To reiterate, in the first application the entry of the nolle prosequi was alleged to be a decision on the merits of the underlying manslaughter charge in New York which barred the state of New York from receiving the plaintiff; in the new application the nolle and its aftermath were alleged to be a jurisdictional bar to Connecticut's surrender of the plaintiff to New York authorities." (emphasis provided)
The Negron court when faced with the issue of whether a subsequent petition was based on the same grounds as the prior petition cited with approval from Sanders supra. The Sanders court gave the following illustration regarding the definition of "ground":
 "(1) By `ground,' we mean simply a sufficient legal basis for granting the relief sought by the applicant. For example, the contention that an involuntary confession was admitted in evidence against him is a distinct ground for federal collateral relief. But a claim of involuntary confession predicated on alleged psychological coercion does not raise a different `ground' than CT Page 7704 does one predicated on alleged physical coercion. In other words, identical grounds may often be proved by different factual allegation. So also, identical grounds may often be supported by different legal arguments." (emphasis provided)
Sanders, 373 U.S. at 16.
The Sanders court, in discussing successive habeas corpus petitions, stated as page sixteen in part as follows:
 Controlling weight may be given to denial of a prior application for federal habeas corpus or Section 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.
In discussing the issue of successive petitions for writ of habeas corpus claimed to be an abuse of remedy, the Sanders court stated at pages 17-18 in part as follows:
 No matter how many prior applications for federal collateral relief a prisoner has made, the principle elaborated in Subpart A, supra, cannot apply if a different ground is presented by the new application. So too, it cannot apply if the same ground was earlier presented but not adjudicated on the merits. In either case, full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ or motion remedy; and this the Government has the burden of pleading.
 To say that it is open to the respondent to show that a second or successive application is abusive is simply to recognize that "habeas corpus has traditionally been regarded as governed by equitable principles. United States ex rel. Smith v. Baldi, 344 U.S. 561, 573, 73 S.Ct. 391, 397, 97 L.Ed. 549 (dissenting opinion). Among them is the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks. Narrowly circumscribed, in conformity to the historical role of the writ of habeas corpus as an effective and imperative remedy for detentions contrary to fundamental law, the principle is CT Page 7705 unexceptionable." Fay v. Noia, supra, 372 U.S. at 438, 83 S.Ct., at 848. Thus, for example, if a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground.
The respondent argues in part in support of the claim of abuse of writ:
Prior to filing the instant action, the petitioner filed several other habeas petitions. All were initiated pro se.
 (1) Civil Action 160200: Arthur Davis v. Frederick Adams, Warden. Therein the petitioner claimed that he was denied free exercise of religion and subjected to cruel and unusual punishment. Although the petitioner filed the petition pro se in March, 1969, the habeas court appointed Edward F. Hennessey III of Robinson 
Cole as counsel for the petitioner.
 (2) Civil Action 186760, Arthur Davis v. Carl Robinson. This action, filed pro se by the petitioner in July, 1974, alleged violations in the terms and conditions of his confinement. Once again, the habeas court appointed counsel for the petitioner.
 (3) Civil action 203558, Arthur Davis v. John Manson. In this action filed April 13, 1976, the petitioner, again acting pro se, complained of ineffective assistance of counsel. Based upon the petitioner's pro se affidavit of indigence, the habeas court appointed Attorney Charles Gill counsel in the action.
 (4) Federal petition H-81-96, Arthur Davis v. Warden. The petitioner raised in federal court claims similar to those presented to this court. The federal petition was dismissed insofar as the petitioner had not exhausted state remedies.
 (5) Federal petition N-85-487 (JAC), Arthur Davis v. Commissioner. Therein the petitioner challenged the correctional institute's calculation of his confinement dates. CT Page 7706
The respondent then argued that "because the petitioner failed to raise his present allegations in his prior complaint, the instant petition for release should be denied".
The Court is not persuaded by that argument.
Of the prior five petitions for writ of habeas corpus filed on behalf of the petitioner, the only one that can arguably be claimed to have raised the same "grounds" as in the present petition is civil action 203558, Arthur Davis v. John Manson. That petition was one of a number of other petitions that were consolidated and agreed to be bound by the decision in Grega v. Warden, 178 Conn. 207 (1979). The issue involved in Grega was whether Conn. Gen. Stat. Sec. 54-43, which authorized the issuance of bench warrants, was unconstitutional on its face, thereby failing to confer jurisdiction on the trial court over the person. After finding that the statute in question was constitutional, the Grega court did not address the claim of ineffective assistance of counsel on its merits when it stated in footnote three as follows:
 In view of our disposition of this case, it is unnecessary to address the plaintiff's claim that he was denied effective assistance of counsel. That claim has been phrased in the following terms: "If the merit of the plaintiff's claim [of lack of jurisdiction] was obvious at the time of plea, was plaintiff's counsel acting competently when he neglected to raise it?" Since we conclude that the plaintiff's underlying jurisdictional claim is without merit and we do not rest that determination upon a waiver theory, the plaintiff's sixth amendment claim, as framed, is inapplicable.
In consolidating the petitioner's case with all of the other cases in Grega, the only claim that was before the court concerning ineffective assistance of counsel has to do with the constitutionality of Section 54-43. This Court concludes that the habeas corpus petition filed on behalf of this petitioner that was consolidated with Grega was based on a different ground then is presently presented in the petition before this Court. This court also notes that it is bound by the factual finding of the United States District Court in federal petition H-81-96 that the petitioner had not previously presented his ineffective assistance of counsel claim to the state courts. McCarthy v. Warden, 213 Conn. 289,293-298 (1989). This court further finds that the CT Page 7707 petitioner's conduct in relation to the present habeas corpus petition does not constitute an abuse of remedy.
2. THE RESPONDENT'S CLAIM THAT THE PETITIONER'S EXTRAORDINARY DELAY IN FILING THE INSTANT PETITION PRECLUDES HABEAS CORPUS REVIEW.
The respondent makes the following argument in support of this claim:
 Additionally, the prosecution's witness statements, ballistic reports, forensic reports and summaries were also missing from the prosecution's file. T. December 29, 2989 at 80-82. Although the court file appeared to be complete, there were no available exhibits, including most importantly, psychiatric reports. Witnesses had died in the intervening years. See, e.g., T. November 17, 1989 at 49.
 These missing items made habeas testimony inadequate. As a result, those testifying were placed at a distinct disadvantage. T. December 28, 2989 at 135; December 29, 1989 at 83. Most importantly, the petitioner's psychiatric evaluations in 1966 could not be presented to this court. . . . .Similarly, the state's files, evidence and exhibits are no longer available. See Respondent's Exhibit 7. Critical evidence, in particular psychiatric evaluations, cannot be located. The state's ability to rebut the petitioner's allegations was thus severely hampered. Under these circumstances, neither addressed nor refuted by the petitioner, the conclusion is clear that the state has been prejudiced in its ability to respond to this petition. See Honeycutt v. Ward, 612 F.2d at 42. Thus, this petition should be dismissed.
The Court is not persuaded by that argument. The Court finds the following additional facts regarding this issue. The state's underlying criminal file does not include any ballistic reports or forensic reports. It does include autopsy reports and some things that were related to the autopsy. It does include also a report filed by the court signed by Dr. Miller, Bancroft and Rubenstein finding that the petitioner was able to understand the nature of the proceedings against him and to to cooperate in the preparation of a defense. There are no other doctor's notes or reports in the state's file. The trial transcripts from CT Page 7708 the underlying criminal trial are fully intact and all exhibits are available. When the petitioner was re-sentenced in 1972 he had been on death row for nearly five years. He did not have any money. It was not until 1975 or 1976 that he became aware in any manner that he could challenge his conviction for his sentence. In 1976 another inmate told the petitioner of potential remedies and the petitioner started to try to raise money to retain an attorney. Between 1972 and 1976 he did not have any contact with any attorney regarding challenging his conviction.
In 1977 — five years after his resentencing — he retained counsel, who set out to obtain the transcript and other materials. Those materials did not arrive until 1978, and by that time his then-counsel, Attorney Cerota, left on a one-year sabbatical. In 1980, counsel informed petitioner that he would not proceed with the case. Finally, with no other obvious remedy, in 1981 petitioner filed a pro se petition for writ of habeas corpus, but brought it in the United States District Court. Attorney Cerota eventually agreed to appear for petitioner, but the case was dismissed without prejudice under the doctrine of Rose v. Lundy,455 U.S. 509 (1982), because it presented at least one claim never presented to the state court — the ineffective assistance of counsel claim raised in this action.
Therefore, petitioner made plans to file the proper action in this Court, but Cerota sought another retainer. Eventually, in late 1982 or early 1983 a fellow inmate agreed to give him funds for counsel and the instant petition was filed in 1985. During this entire period, petitioner understood that there was no time limit on bringing habeas corpus actions. Since then, the present habeas corpus petition has been pending.
The rule regarding untimely petitions, as stated in Honeycutt v. Ward, 612 F.2d 36, 42 (2d Cir.), Cert. Denied,446 U.S. 985 (1979) is as follows:
 While it is important that one convicted of crime in violation of constitutional principles should be accorded relief, it is also important that reasonable diligence be required in order that litigation may one day be at an end. Rule 9(a) guards the state's legitimate expectation that it will not be called upon, without due cause, to defend the integrity of convictions that occurred many years ago, where records and witnesses are no longer available. CT Page 7709
Considering all of the facts surrounding the attempts by the petitioner to be heard regarding his claims, this Court finds that the delay in filing the instant petition does not preclude habeas corpus review and that the petitioner has exercised reasonable diligence.
3. THE RESPONDENT'S CLAIM THAT THE PETITIONER HAS FAILED TO ESTABLISH SUFFICIENT "CAUSE" OR "PREJUDICE" TO WARRANT BELATED REVIEW OF HIS CLAIM WHICH DOES NOT ALLEGE INEFFECTIVE ASSISTANCE OF COUNSEL.
In support of this claim the respondent argues in part as follows:
"The Connecticut Supreme Court has repeatedly and consistently held that a petitioner's access to habeas corpus is not to be used as an alternative to direct appeal. See, e.g. Galland v. Bronson, 204 Conn. 330, 333, 527 A.2d 1192
(1987); Paulsen v. Manson, 193 Conn. 333, 337-38,476 A.2d 1057 (1984). The validity of those rules of procedural default have been emphasized in recent state and federal case law. The first such decision is the United States Supreme Court's determination that the "cause and prejudice" standard should be applied to determine whether, under abuse of the writ principles, a claim not raised in a petition for writ of habeas corpus is entitled to review in a successive petition. McClesky v. Zant, 111 S.Ct. 1454 (1991). The second recent development is the declaration by our Connecticut Supreme Court that the federal "cause and prejudice" standard should be applied to determine whether claims forfeited at a petitioner's criminal trial are entitled to habeas corpus review in the first instance. Johnson v. Commissioner,218 Conn. 403, 589 A.2d 1214 (1991).
In light of this explicit case law, the respondent submits that petitioner's petition for a writ of habeas corpus should be dismissed because he has not alleged and cannot prove sufficient "cause" for failing to assert this claim in an earlier petition, nor that sufficient "prejudice" would result from this default."
In Johnson v. Commissioner, none of the petitioners alleged cause and prejudice standards. They all alleged the deliberate bypass standard. In adopting the cause and prejudice standard in Johnson, our state Supreme Court did not dismiss the petition because they had not alleged the cause and prejudice standard but rather addressed the "cause" standard on its merits. For that some reason, this Court will not dismiss for failure of the petitioner to allege the cause and prejudice standard. CT Page 7710
In discussing the "cause" and "prejudice" test the court in Murray v. Carrier, 477 U.S. 478, 91 L.Ed.2d 397,106 S.Ct. 2638, at 488 stated in part as follows:
 Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, see Reed. v. Ross, 468 U.S., at 16, 82 L.Ed.2d 1, 104 S.Ct 2901, or that "some interference by officials," Brown v. Allen, 344 U.S. 443, 486, 97 L.Ed 469, 73 S.Ct 397 (1953), made compliance impracticable, would constitute cause under this standard . . . It is clear that respondent failed to show or even allege cause for his procedural default under this standard for cause, which Engle squarely supports. Respondent argues nevertheless that his case is not controlled by Engle because it involves a procedural default on appeal rather than at trial. Respondent does not dispute, however, that the cause and prejudice test applies to procedural defaults on appeal, as we plainly indicated in Reed v. Ross, 468 U.S., at 11, 82 L.Ed.2d 1, 104 S.Ct. 2901. Reed, which involved a claim that was defaulted on appeal, held that a habeas petitioner could establish cause for a procedural default if his claim is "so novel that its legal basis is not reasonably available to counsel," id, at 16, 82 L.Ed.2d 1, 104 S.Ct. 2901. That holding would have been entirely unnecessary to the disposition of the prisoner's claim if the cause and prejudice test were inapplicable to procedural defaults on appeal . . . These legitimate state interests, which are manifestly furthered by the comparable procedural rule at issues in this case, warrant our adherence to the conclusion to which they led the Court in Reed v. Ross — that the case and prejudice test applies to defaults on appeal as to those at trial. (emphasis provided)
It is clear from Murray that claims of ineffective assistance of counsel do not involve the cause and prejudice standard. However, in so far as all the remaining claims raised by this petitioner, the petitioner has failed to show CT Page 7711 that some objective factor external to the defense impeded the raising of such claims on direct appeal. Accordingly, this Court will only reach the merits of the claim of ineffective assistance of counsel.
THE PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL.
In order for a petitioner to prevail on a claim of ineffective assistance of counsel, it is necessary that the petitioner meet the criteria established in Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 105 S.Ct. 2052. Strickland held that there are two components to a claim of ineffective assistance of counsel that have to be met in order to require reversal of a conviction:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudices the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . ."
Strickland held that the role of the Court in an ineffective assistance claim to be as follows:
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a Court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or admission of counsel was unreliable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption under the CT Page 7712 circumstances, the challenged action `might be considered sound trial strategy'. . . . Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (emphasis provided)
The petitioner makes the following two basic arguments in support of his claim of ineffective assistance of counsel:
 1. Counsel failed to complete a reasonable pre-trial investigation and to develop the record relating to alcohol use and its impact on sanity and specific intent.
 2. Petitioner did not receive effective assistance of counsel at his re-sentencing in 1972.
These claims will be considered seriatim.
1. THE PETITIONERS CLAIM THAT COUNSEL FAILED TO COMPLETE A REASONABLE PRE-TRIAL INVESTIGATION AND TO DEVELOP THE RECORD RELATING TO ALCOHOL USE AND ITS IMPACT ON SANITY AND SPECIFIC INTENT.
One of the leading cases regarding the duty to investigate is State v. Talton, 197 Conn. 280, 297, 298
(1985) in which the Court stated in part as follows:
 "The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that his attorney, without reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be an evaluated not through hindsight but from the perspective of the attorney when he was conducting it." (emphasis provided)
In discussing the issue of investigation, Strickland held at page 691 as follows:
 The reasonableness of counsel's actions maybe determined or substantially influenced by the CT Page 7713 defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant maybe critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. (emphasis provided)
The petitioner makes the following arguments in support of his claim:
 The defense concluded at a relatively early date that the only contested issue would be the element of intent. (Hab. Tr. 6/2/89 at 10). Insofar as a defense based on some other issue appeared unlikely, there was nothing inherently unreasonable in that decision. However, once the decision to limit the defense was made, the defense marshalled the facts in such a limited, inadequate way as to deprive Davis of the effective assistance of counsel.
 There is no dispute that Davis was not a good source of information, for reasons beyond his control. However, as Investigator Donohue testified, when a source of information is not good, the defense must go to other sources. (Id. 6/22/90 at 30). Attorney John Williams, testifying as an expert witness, agreed that when a client is disabled "facts must be developed elsewhere." (Id. 10/27/89 at 43). Any lawyer at the time "would have gotten his investigator out into the street to really get to know [Davis], to know him better than he knew himself." (Id. at 41).
The Court is not persuaded by the above argument. First CT Page 7714 of all the claim that the petitioner was not a good source of information for reasons beyond his control has not been established from the facts presented at the habeas hearing. The record clearly demonstrates that the petitioner was examined prior to his underlying criminal trial by Doctor Miller, Doctor Bancroft and Doctor Rubenstein and they found that the petitioner was able to understand the nature of the proceedings against him and to cooperate in the preparation of a defense. It is true that he in fact did not cooperate with defense counsel in the preparation of his defense but he was able to cooperate in that preparation of defense.
The Court makes the following additional findings of fact regarding this claim of ineffective assistance of counsel. The petitioner was represented at all times by the New Haven public defender. The public defender had the use of a full time investigator and an assistant public defender both of whom assisted him at the petitioner's trial. After learning of the petitioner's arrest the public defender immediately commenced to represent him. The public defender sent John Donohue, his investigator to New Jersey to contact the petitioner prior to the time the New Haven Police arrived to question him. The investigator was able to obtain information regarding the petitioner's intoxication at the time of his arrest and to advise him not to make any incriminating statements while incarcerated. The public defender interviewed the petitioner immediately after the petitioner returned to Connecticut from New Jersey. The public defender had access to the state's attorneys file. He had seen all of the state's forensic and ballistic evidence as well as the photos of the scene of the crime. He had also reviewed all of the statements given by witnesses for the state. All of the witnesses that were suggested by the petitioner and the petitioner's family were interviewed either by the public defender or by his investigator. The investigation included speaking with the petitioner's mother, with the petitioner's brother, Robert and with Franklin Dunham a defense witness who was the last person with the petitioner prior to the shooting. A defendant who refuses to cooperate with defense counsel by failing to inform counsel of potential witnesses cannot later claim that defense counsel was ineffective by failing to call such witnesses. The investigation decisions that are made are based on information that is often supplied by the defendant. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information" Strickland Id. at page 691. CT Page 7715
This Court concludes that the investigation conducted by defense counsel in this case clearly met the performance standards mandated by Strickland.
The petitioner further argues that defense counsel did not properly prepare his expert witnesses. The argument is made that defense counsel did not realize the petitioner was a chronic abuser of alcohol and that the defense "did not take into account long-term abuse of alcohol or alcohol-related blackouts. If that decision was made after a reasonable investigation, the decision would not necessarily be below the standards of a reasonably competent defense attorney. However, where as here the record is clear that any investigation was severely truncated, to say the least, that decision was not reasonable."
The Court is also not persuaded by that argument.
The Court finds that the petitioner has failed to prove by a fair preponderance of the evidence his claim of long term abuse of alcohol or his claim of alcohol related blackouts.
The petitioner further argues that defense counsel's "questioning of the expert witnesses was below the standard of a reasonably competent defense attorney because it did not focus on the appropriate legal tests."
The Court is also not persuaded by that argument. The argument that is made is bootstrapped by the decision of our state supreme court on the direct appeal from the conviction. In judging the performance standard of defense counsel, every effort must be made to eliminate the distortion of hindsight. Further there is no credible evidence that the petitioner, in fact, was insane and therefore, there was no prejudice to the petitioner from the inability of the expert witnesses to render such an opinion.
The petitioner further argues that defense counsel "should have explored in more detail Dunham's assertions to him that the written statement he gave, PX-1, was the result of police coercion. Under the due process clause of thefifth amendment, the statement could have been suppressed if it was the product of outrageous police misconduct."
The Court finds from the evidence presented that in fact the statement given by Franklin Dunham was not the result of police coercion. Therefore, a motion to suppress would have been denied. CT Page 7716
The petitioner has failed to overcome the presumption under the circumstances that the challenged action of defense counsel might be sound trial strategy. The strategic choices made by defense counsel were all well within the range of professionally responsible judgment.
In summary this court finds that the petitioner has failed to make the required showing of either deficient performance or sufficient prejudice.
2. THE PETITIONER'S CLAIM THAT HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS RE-SENTENCING IN 1972.
In claiming that the defense counsel's failure to advance any mitigating evidence at the re-sentencing in 1972 was unreasonable under prevailing standards, the petitioner argued in part as follows:
 Attorney Williams testified that the reasonable practice at serious sentencing hearings in 1972 would have been to present "quite a bit of evidence [which] would have made this sentencing hearing a major production." (Hab. Tr. 10/27/89 at 57). At least in a case where the sentence may involve serious consequences, counsel is expected to look for "mitigating family background witnesses and medical history." Osborn, 861 F.2d at 627.
The Court is not persuaded by that argument.
From the evidence presented the Court makes the following additional findings of fact. After the United States Supreme Court vacated the death penalty, the procedure to be followed for those persons who have the death penalty imposed was rare and difficult for everyone to agree as to what would happen next. The Connecticut Supreme Court remanded the case to the trial court to be set down for re-sentencing. Re-sentencing was done before a different three judge panel. The petitioner has failed to prove whether the new three judge panel had been provided a transcript of the prior trial resulting in the petitioner's conviction prior to re-sentencing. No witness were presented by defense counsel at the re-sentencing hearing. No new evidence was presented to the sentencing panel as there was no new evidence available.
Strickland arose out of a death sentencing hearing. The relevant facts in Strickland, Id., page 672, were as follows:
In preparing for the sentencing hearing, CT Page 7717 counsel spoke with respondent about his background. He also spoke on the telephone with respondent's wife and mother, though he did not follow up on the one unsuccessful effort to meet with them. He did not otherwise seek out character witnesses for respondent. App. to Pet for Cert A265. Nor did he request a psychiatric examination, since his conversations with his client gave no indication that respondent had psychological problems. Id., at A266.
 Counsel decided not to present and hence not to look further for evidence concerning respondent's character and emotional state. That decision reflected trial counsel's sense of hopelessness about overcoming the evidentiary effect of respondent's confessions to the gruesome crimes. See id., at A282. It also reflected the judgment that it was advisable to rely on the plea colloquy for evidence about respondent's background and about his claim of emotional stress: the plea colloquy communicated sufficient information about these subjects, and by forgoing the opportunity to present new evidence on these subjects, counsel prevented the State from cross-examining respondent on his claim and from putting on psychiatric evidence of its own. Id., at A223-A225.
In finding that defense counsel met the required performance standard, the Strickland court, at pages 698-699, held as follows:
 Application of the governing principles is not difficult in this case. The facts as described above, see supra, at 671-678, 80 L.Ed.2d 683-687, make clear that the conduct of respondent's counsel at and before respondent's sentencing proceeding cannot be found unreasonable. They also make clear that, even assuming the challenged conduct of counsel was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence.
 With respect to the performance component, the record shows that respondent's counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes. Although counsel understandably felt hopeless about respondent's CT Page 7718 prospects, see App. 383-384, 400-401, nothing in he record indicates, as one possible reading of the District Court's opinion suggests, see App. to Pet for Cert A282, that counsel's sense of hopelessness distorted his professional judgment. Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable.
In discussing the prejudice aspect, the Strickland court, at pages 699-700, held as follows:
 With respect to the prejudice component, the lack of merit of respondent's claim is even more stark. The evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent though he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and hence, the sentence imposed.
In this case, the strategic choice of defense counsel to rely on oral argument was well within the range of professionally reasonable judgment.
Further, given the overwhelming aggravating factors, there is no reasonable probability that the claimed omitted evidence would have changed the sentence.
Finally, the petitioner argues that defense counsel was ineffective in failing to appeal to the Sentence Review Division.
Defense counsel believed that there was no right to appeal a three judge panel sentence to the Sentence Review Division for review of the sentence imposed. State v. Delgado, 161 Conn. 536, 561 (1971) held that:
The commission recommended the establishment of the CT Page 7719 sentence review procedure to enable the offender to "enter the crucial first stage of prison life with at least one less grievance and with a feeling that his sentence does not represent the bias and prejudice of a single judge". (emphasis provided)
As a result of this language, the decision by defense counsel not to appeal the petitioner's sentence to the Sentence Review Division was well within the performance standard of Strickland.
Finally, it is clear that the petitioner has failed to prove any prejudice from the failure to appeal his sentence to the Sentence Review Panel. Even the petitioner's expert witness was of the opinion that the Sentence Review Panel would not have changed the sentence that was opposed.
This court has reconstructed the circumstances of defense counsel's challenged conduct and evaluated that conduct from defense counsel's perspective at the time. The petitioner has failed to overcome the presumption that the challenged actions might be considered to be sound trial strategy. This Court finds that defense counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment.
ORDER
The petition for writ of habeas corpus is dismissed.
BY THE COURT,
Hon. Sidney Axelrod, J. Superior Court Judge